# Cartwright v. Bamberger, Bloom & Co.

*Bill in Equity to Set Aside an Attachment on the Ground of Fraud.*

1. *Fraudulent attachment.*—In a suit in equity to set aside an attachment of an insolvent debtor's stock of goods as fraudulent, the evidence showed that the attaching creditor was the debtor's head clerk, and held claims against him for money loaned and balance of salary, amounting to $2,959; that the attaching creditor procured the transfers to him of claims against the insolvent debtor from a bank, the debtor's mother, and his prospective brother-in-law, aggregating $6,380, for which he gave his notes; that the debtor was instrumental in having the transfers made by his mother and his prospective brother-in-law to the attaching creditor after the latter had threatened to attach; and that on the same day these transfers were made the creditor sued out an attachment for the aggregate of the claims transferred to him and his individual claim against the debtor. There was direct evidence tending to show that these claims were just, and that the attachment was in good faith, while there was

[Cartwright v. Bamberger, Bloom & Co.]

nothing to impeach the transaction but the unusual and suspicious circumstances. At the sale the attaching creditor bought in the whole stock for 60 cents on the dollar. There was no positive evidence that the attaching creditor had any available means with which to make the said purchase, except the $2,959 due him from the insolvent debtor, and the other claims transferred to him. *Held*, that the attachment should not be set aside as fraudulent and collusive. (STONE, C. J., dissenting.)

APPEAL from Decatur City Court, in Equity.

Heard before the Hon. W. H. SIMPSON.

The bill in this case was filed on March 5, 1890, by the appellees, Bamberger, Bloom & Co., against Herbert Cartwright, I. Pinkus and S. P. Ryan, the sheriff who levied the attachment. The purpose of the bill, as shown by its prayer, was to have set aside, as collusive, fraudulent and void, an attachment issued from the City Court of Decatur, at the instance of Herbert Cartwright against I. Pinkus & Co., which attachment was sued out on March 3, 1890, and levied upon the stock of goods of said I. Pinkus & Co., and that the sheriff be restrained from disposing of the proceeds of said property in payment of the alleged indebtedness claimed in said attachment proceedings. The facts of the case are set forth at length in the opinion.

On the final hearing of the cause, upon pleadings and proof, the judge, sitting as chancellor, declared that the said attachment was fraudulent and collusive, and decreed that the same be set aside, vacated and annulled. The defendants appeal, and assign as error this final decree.

R. A. McCLELLAN and KYLE & SKEGGS, for appellants.—(1.) The case at bar is governed by the same rules and principles of law as if it were charged in the bill that the fraudulent conveyance had been executed by I. Pinkus & Co. to Herbert Cartwright.—*Cartwright v. Bamberger, Bloom & Co.*, 90 Ala. 405. (2.) There is a distinction to be observed in considering the issues in this cause. If the consideration of the conveyance (in this case the attachment) be a past *bona fide* indebtedness, and the property conveyed (attached) be not unreasonably disproportionate in value to the amount of the debt, and no benefit is reserved to the grantor, I Pinkus & Co., then the intent of the grantor or grantee, whether it be fraudulent or not fraudulent, or whether the grantee, Cartwright, had notice of or participated in the fraud or not, if there was fraud, is entirely immaterial.— *Crawford v. Kirksey*, 55 Ala. 293 ; *Carter Bros. & Co. v. Coleman*, 82 Ala. 177 ; *Levy & Co. v. Williams*, 79 Ala. 175-6 ; *Carter v. Coleman*, 84 Ala. 256 ; *Hodges v. Coleman*, 76 Ala.

119; *Wood v. Moore*, 84 Ala. 253; *Mobile Savings Bank v. McDonnell*, 89 Ala. 447; *Harmon v. McRea*, 91 Ala. 401; *Harris v. Russell*, 93 Ala. 59. (3.) If the conveyance (attachment) be upon a new consideration, then the motives, intent and knowledge of the parties become material, and are a proper subject of investigation and consideration.—*Dollins v. Pollock*, 89 Ala. 351; *Meyer v. Sulzbacher*, 76 Ala. 120 ; *Beachman v. Koch, et al.*, 92 Ala. 452; 8 So. Rep. 707; *Crawford v. Kirksey*, 55 Ala. 293 ; *Carter v. Coleman*, 82 Ala. 177. (4.) If I. Pinkus had anything or every thing to do with the attachment, then the preference he thus gave among his creditors falls under the general doctrine as to fraudulent conveyances as often proclaimed in this State. The doctrine is, that an insolvent debtor has a right to give preference among his creditors if his assets are not enough for all; that the debts to which preference is given shall be really due ; that no benefit shall be reserved to him; and that he shall get a reasonably fair price for his assets ; and in such case, the preference is valid no matter how fraudulent the intent of all the parties may have been.—*Knowles v. Street*, 87 Ala. 357; *Wood et al. v. Moore, et al.*, 84 Ala. 253 ; *Middleton v. Wilson & Lozano*, 84 Ala. 265 ; *Levy & Co. v. Williams;* 79 Ala. 176.; *Chipman, Calley & Co. v. Stern & Co.*, 89 Ala. 207 ; *Dollins & Adams v. Pollock & Co.*, 89 Ala. 351 ; *Mobile Savings Bank v. McDonnell*, 89 Ala. 447 ; *Shealy & Finn v. Edwards*, 78 Ala. 176 ; *Rankin & Co. v. Vandiver & Co.*, 78 Ala. 562 ; *Hodge Bros. v. Coleman & Carroll*, 76 Ala. 103 ; *Meyer & Co. v. Sulzbacher*, 76 Ala. 120; *Harmon v. McRea*, 91 Ala. 401. .

HUMES, SHEFFEY & SPEAKE, and W. R. FRANCIS, *contra*.—(1.) The existence of complainant's debt being established at the time this attachment was sued out, the burden of proof is upon defendant to establish the *bona fides* of the transaction. This fraudulent attachment stands upon the same footing as fraudulent conveyances. When a conveyance is attacked by a creditor, and he proves the existence of his debt at the time the conveyance was made, then the burden of proof is upon the grantee to prove a valuable consideration for the conveyance.—*Pollak v. Searcy*, 84 Ala. 259; *Owens v. Hobbie*, 82 Ala. 469. (2.) The Supreme Court of Alabama in the case at bar have announced that it was incumbent upon defendant to show the valuable character of the consideration for this attachment and the *bona fides* of the transactions.—*Cartwright v. Bamberger, Bloom & Co.*, 90 Ala. 405. (3.) The relation existing between Pinkus and

[Cartwright v. Bamberger, Bloom & Co.]

Cartwright casts upon Cartwright the burden of making clearer and fuller proof than if they had not been so related.—*Pollak v. Searcy*, 84 Ala. 259. (4.) The vigilant creditor may procure the payment of his claim against an insolvent debtor by the purchase of his property, but he must not go beyond the permissive purpose of securing his own demand.—*Levy v. Williams*, 79 Ala. 171. (5.) A judgment may be obtained on an honest debt and yet if obtained for a fraudulent purpose it is void as to all whose rights are offended.—*Hubbard v. Allen*, 59 Ala. 285. (6.) The facts of this case justify the conclusion that the attachment was sued out by collusion between the attaching creditor and the insolvent debtor, and for the purpose of hindering, delaying and defrauding the debtor's other creditors.—*Stix & Co. v. Keith*, 85 Ala. 465; *Mobile Savings Bank v. McDonnell*, 89 Ala. 447; *Gainesville National Bank v. Bamberg*, 13 S. W. Rep. 959; Wait on Fraudulent Conveyances, §§ 196, 197, 201, 207.

HEAD, J.—The demurrers to the bill were determined adversely to the appellant when this cause was before us at a former term.—90 Ala. 405. We see no reason to depart from the ruling then made.

Isaac Pinkus, by the name of I. Pinkus & Co., did business, as a merchant, at Decatur, Ala., from April 7th, 1888, to March 3d, 1890. Appellant, Cartwright, was employed as chief clerk in the store from January 1st, 1888, to the latter date. On that day, March 3d, 1890, he, Cartwright, claiming to be a creditor of Pinkus in the sum of $9,500.00, sued out an attachment against him, for that sum, on the ground that he, Pinkus, had money, property or effects liable to satisfy his debts which he fraudulently withheld; and, on the same day, the attachment was levied by the sheriff on all the goods then in the store. The goods so levied on, taken at cost, invoiced at $12,000 to $14,000. Two days thereafter, to-wit, March 5, 1890, appellees, Bamberger, Bloom & Co., likewise sued out an attachment against Pinkus to recover a debt owing them of $3,893.83, and caused the same to be at once levied on the same goods. The claims of Herbert Cartwright, which his attachment seeks to enforce, consisted of an alleged claim contracted originally with him by Pinkus, amounting, at the date of the attachment, without interest, to the sum of $2,959.40, and the claims of three other persons alleged to have been purchased by Cartwright on the day of the attachment, viz., Hannah Pinkus, the mother of Isaac, the debtor, amounting to $2,285.71, Abe Spitzer,

amounting to $2,700, and the First National Bank of Decatur, amounting to $1,400. On March 5th, 1890, complainants, appellees, filed this bill to set aside the appellant's attachment as collusive and fraudulent. The particular averment upon which the equity of the bill rests, as contained in the 6th paragraph of the amended bill, is, that if Pinkus was indebted to appellant it was only in a small sum, the amount of which is to complainants unknown ; that Pinkus and appellant combined and confederated to procure from the mother of Pinkus and from one Abe Spitzer, the intended brother-in-law of Pinkus, a transfer of the claims held by them, respectively, against said Pinkus, to enable said Cartwright to procure an attachment against the property of Pinkus for the purpose thereby of hindering, delaying and defrauding the other creditors of Pinkus, and that said alleged claims of the mother and of Spitzer were and are simulated and fraudulent. It is alleged generally, in the original bill, that the claim upon which Cartwright's attachment was issued was simulated. The insolvency of Pinkus, and appellant's knowledge thereof, at the time of the purchase of these claims by Cartwright and the issuance of his attachment, are averred. Appellant's answer fully denies all the charges of fraud and collusion ; alleges the *bona fides* of all his asserted claims, as valid subsisting demands owing by Pinkus, and sets forth the consideration of each debt, when contracted and how evidenced. He admits he knew Pinkus was indebted, but denies that he was fully informed of the amount of his indebtedness.

Thus we see, the important and controlling inquiry is, whether or not appellant's claims were all just and subsisting debts owing by Pinkus at the time the attachment was sued out. We will examine each of them in the light of the evidence.

1. It is not denied, but conceded, that the claim of the First National Bank of Decatur was and is valid, and was purchased by and transferred to appellant on the day of the attachment.

2. Appellant's own claim. This claim, amounting to $2,959.40, is evidenced as follows : Two promissory notes made by Pinkus to appellant, the one on May 22, 1889, for $1,000, payable one day after date, and the other on the next day, May 23, 1889, for $1,250, payable Jany. 1, 1890, with interest from date ; and two due bills made by Pinkus to appellant, one on Nov. 16, 1889, for $250, and the other on Jany. 1, 1890, for $409.40. Both Pinkus and appellant testify positively and with emphasis, that the two notes and

the due bill for $250, were given to appellant by Pinkus, on their respective dates, for the amount of money respectively stated in each, then actually loaned to Pinkus by appellant; and that each of said notes and due bill were actually due, owing and unpaid to appellant on March 3d, 1890, when the attachment was sued out. On the first of January, 1889, appellant entered the service of Pinkus as a clerk, at a salary of $100 per month, and continued therein until he sued out the attachment. Both he and Pinkus testify that on January 1st, 1890 they had a settlement on account of salary, and ascertained a balance in appellant's favor, for the preceding year's work, of $409.40, and that the due bill of that date and amount was given therefor, and was actually due and owing on March 3d following. Pertinent to the validity of these claims is the inquiry, what were appellant's means and ability to make these alleged loans? It is shown that on May 9th, 1887, appellant being then not quite twenty years of age, but having had his disabilities of infancy removed, M. T. Cartwright, his father and legal guardian, made final settlement of his guardianship in the Probate Court of Morgan county, Alabama, wherein a balance of $2,313.19 was ascertained in appellant's favor, and the same was then paid to him. These facts are shown by a certified copy of the settlement, as well as by the testimony of M. T. Cartwright and appellant. Appellant testifies that this was the money he loaned to Pinkus; that before loaning it he kept it, the greater portion of the time, in an iron drawer in his father's safe, to which drawer he had access at all times, and carried a key to it. It was also, he says, for a time placed in the iron drawer, in connection with some deeds and mortgages of his father, and placed in the bank. He swears that this money was not invested from May, 1887, to May, 1889, and was not at any time deposited in bank to his credit. In the final account of M. T. Cartwright as guardian, he charged himself with an item : "Nov. 30, 1886. To amount from W. R. Peck on land $1,500.00." In his deposition, in this cause, he testifies that he sold the land of his ward for $2,200, and reported $1,500 in his account on final settlement, and that his son afterwards collected the balance of $700, but it nowhere appears when he collected it, or what disposition was made of it. So far as the record informs us, it may have been collected subsequent to March 3d, 1890. Speaking of the $2,313.19 paid on the final settlement, M. T. Cartwright further testifies as follows : "I know he [his son] put the money in my safe, and I told him to use his money as he saw proper. He had most of his money in my safe

[Cartwright v. Bamberger, Bloom & Co.]

for a year or so; he kept it in an iron drawer in the safe until I carried it to the bank and put it in the vault of the bank, and it staid there, I don't know how long. I had some notes and mortgages also in the drawer and some cash. . . . Herbert Cartwright put that money, I believe, in an envelope, and put it in my safe. He made no investment with this money that I know of. He did not purchase any property, that I know of, with this money. This money probably remained in my safe and private box at the bank four or five months. I went and got the box out of the bank. I wanted to get some papers, and I put the iron box back in my safe. Herbert Cartwright said to me one day that Pinkus wanted to borrow some money and asked me how I thought it would do to loan him some money. I told him that I regarded him good, that he could do as he pleased about it. I don't remember of his using it (the money) until he loaned it to I: Pinkus & Co. He sometimes consulted me in reference to investments in real estate, &c. I believe I did advise him once to invest in bank stock here ; he might have said something to me at other times, but I always told him to suit himself about investing his means." About Sept. 12th, 1888, appellant "refugeed" from the yellow fever in Decatur to Huntsville, Ala., and took a position as clerk with Campbell & Son, at $50 per month, and continued there until January 1st, when he returned to Decatur, and took the position as clerk with Pinkus at $100 per month. For several years just prior to going to Huntsville he lived with and clerked for his father, in Decatur. It is not shown what salary, if any, was paid him by his father, but it may be fairly assumed that he at least earned and received from his father, during that time, a living and all necessary personal expenses. His father was a business man in Decatur and was worth during all these transactions and at the time he · testified, between $25,000 and $30,000, over all liabilities. Appellant's gross earnings due by salaries from Campbell & Co. and Pinkus from about Sept. 12, 1888, to Nov. 16th, 1889, the date of the $250 due bill given to him by Pinkus for alleged borrowed money, amounted to $1,175. Adding to this, his salary for November and December, 1889, $200, the gross earnings to Jan. 1, 1890, amounted to $1,375. Of this sum according to his claim, $409.40 had not been paid, but was still owing him by Pinkus, and was one of the demands for which the attachment was sued out. Deducting that, and he had realized in salaries in round figures $965, from which to defray his personal expenses,

[Cartwright v. Bamberger, Bloom & Co.]

whatever they may have been, and supplement the fund of
$2,313.19, received from his guardian, to the extent of rais-
ing the aggregate sum of $2,500 claimed to have been loaned
to Pinkus. The evidence does not disclose any other reve-
nue. or income received by appellant, except the statement
of M. T. Cartwright, above referred to, that his son col-
lected $700 purchase-money of land after his final settle-
ment. Complainants drew out of the witness Littlejohn,
cashier of the Decatur Bank, that appellant "is a young
man of excellent business habits and good moral character,"
and deeming it not improbable that he lived with his father
and was at slight expense, we think it not unreasonable to
believe that he saved enough from his earnings to increase
the sum of $2,313.19, if he kept that on hand as claimed, to
$2,500, the amount claimed to have been loaned to Pinkus.

3. The Spitzer claim. Mr. Spitzer was engaged in the
liquor saloon business during the year 1889 in Decatur,
Birmingham, Montgomery and Mobile, owning a one-half
interest in the saloons in Decatur, Birmingham and Mont-
gomery, and the whole interest in Mobile. He was con-
nected with J. M. Friedman, in Decatur, up to the latter
part of that year, when he had a settlement with Friedman,
and thereafter retained only a small interest in the business.
He had previously, in June of that year, made a settlement
with Friedman, but the business continued on until the end of
the year. During that year he travelled from one of the above
named places to another, with headquarters at Mobile, and
visited Decatur often. The business in Decatur was carried
on in the name of J. M. Friedman. It is not shown in whose
names they were carried on in Birmingham and Montgomery.
In each of the several business concerns (saloons), there
was carried a stock and fixtures worth about $1,500, which
were increased as the business justified. When asked the
question, he testified that he did not owe anything on these
establishments on the first of July, 1889, as he bought for
cash. He testified further that he kept a bank account in
San Antonio, Texas, in 1889, with Morris Friedman, and
also a bank account with either the First or Second National
Bank of Mobile, in 1889, he did not remember which. At a
later period in his examination he stated that he had his
bank book of the Mobile Bank, at Augusta, Ga., and would
send it to the commissioner to be attached to his deposition.
A copy of it appears in the record and is treated by the
parties as a part of this witness's deposition. It shows the
witness's accounts with the First National Bank of Mobile,
opening May 1, 1889, and ending Dec. 31, 1889, and discov-

ers average deposits of about $1,200 per month against which were checks leaving small balances in depositor's favor, each month, with a balance at the end of the year of $1,494.97. The San Antonio bank account is not before us. Spitzer testified that as his money accumulated in the Mobile bank he drew it out and sent it to San Antonio for investment; and every time he got $500 he sent it off; that during the year 1889 he kept some of his money deposited in bank and some he did not, as he did a loaning business. He stated that his earnings in Mobile for the first six months were $5,000 clear; that he was worth in 1889 between $15,000 and $17,000, over and above all incumbrances. At the time of the transaction in question, Spitzer was an intimate friend of Pinkus and was engaged to be married to the latter's sister. This is a brief resume of his financial status, and personal relations to Pinkus, as taken from his deposition. His claims against Pinkus transferred to Cartwright are as follows: Aug. 7, 1888, due-bill made by Pinkus to J. M. Friedman for $250, on which was due a balance of $175, transferred by Friedman to Spitzer, and for which Pinkus gave Spitzer his note Jan. 1, 1889; Jan. 8, 1889, one day note of Pinkus to Spitzer for $735.54; June 29, 1889, same for $1,000; July 3, 1889, same for $500.37; Aug. 7, 1889, same for $1,000. Total, $3,410.91; all claimed to have been given for money loaned to Pinkus, at the times, and in sums corresponding with the respective notes. It is alleged by Cartwright that Pinkus paid on this indebtedness, on Aug. 26, 1889, $500; that on Oct. 10, 1889, they had a settlement, when the balance due, with interest, amounted to $3,007.55, for which Pinkus gave Spitzer his note and took up the existing notes. Early in January, 1890, as alleged, Pinkus paid on this note $369.68, and on Jan. 18, 1-90, they had another settlement, computing interest to Jan. 13th, and ascertained a balance due Spitzer of $2,700, for which Pinkus gave him his 90 day note for $1,700, a due-bill for $600, and two due-bills for $200 each; and these are the evidences of debt which Spitzer transferred to appellant, Cartwright, on March 3d, 1890, the day of the attachment. It is also shown, incontrovertibly, that the note above mentioned for $3,007.55 was placed by Spitzer, in December, 1889, in a bank in New Orleans, for collection, and by that bank sent to the First National Bank of Decatur for collection on Dec. 28th, 1889.

4. The Hannah Pinkus claim. We are entirely satisfied from the evidence, that Pinkus borrowed from his mother, Hannah Pinkus, in April, 1888, her part of the money re-

[Cartwright v. Bamberger, Bloom & Co.]

ceived from insurance on the life of her husband amounting
to $2,285.71, and owed it to her on March 3, 1890. The proof,
to our minds, is clear on this point, and we deem it unneces-
sary to point out or discuss it in detail. Her transfer to ap-
pellant passed to him a valid claim for that sum.

The main difficulty in this case, arises upon the validity
of the claims of Spitzer, and the original individual claims
of appellant. It is not denied that the burden of proof is
upon appellant to establish their validity; nor is it denied
that the relation sustained by the parties participant in the
transactions under review to each other, were such as to in-
cite one to closely scrutinize their actions and demand
clearer proof of the claims they set up than would be required
of persons sustaining less intimate and confidential rela-
tions. Tested by this rule, it is incumbent upon appellant
to explain fully how each item of the alleged indebtedness
arose, and clearly satisfy the mind of the court that it is
just and valid. The production of notes executed by Pinkus
does not prove their validity as against existing creditors,
as appellees are shown to have been. The proof must go
further and show *bona fide* consideration—that the notes are
what they purport to be, real and not fictitious. Let us ex-
amine first each item of the claims of Spitzer. We will over-
look the Friedman due-bill for the balance of $175. The next
item is $735.54. As to this, Pinkus testifies, on direct ex-
amination by appellant, as follows: "The next amount that
I got from Mr. Abe Spitzer was the following check of
$735.54 which was obtained from him on Jan. 8, 1889, and
for which I gave him my promissory note payable one day
after date with interest from date at 8 per cent per annum."
He produces a note conforming to that description and ap-
pends it to his deposition. On cross examination he says:
"The $735.54 was received from Spitzer on January 8th,
1889, by him handing me a foreign check for that amount in
Decatur, Ala., at my place of business. I am not sure, but
I think it was in the first room up stairs over the store. I
am not sure whether this amount was deposited in bank on
that day. I am not sure what I did with the check; per-
haps I deposited it, which I think I did, and it may have
been with other amounts." Pinkus kept a bank account
with the First National Bank of Decatur, a copy of which
for the year 1889 and January and February, 1890, proven
by the cashier of the bank, is in evidence. The account was
balanced Jan. 1, 1889, and a balance in favor of Pinkus
brought forward of $1,069.61. This account shows that
Pinkus deposited Jan. 10, 1889,—two days after the alleged

loan of $735.54,—the sum of $1,002.54. He made six other deposits through that month averaging about $285 each. This is all the testimony of Pinkus touching specially this particular loan. Spitzer testifies: "My next business transaction with him (Pinkus) was on Jan. 8, 1889. I loaned I. Pinkus & Co. $735.54 by draft, he in return gave me his note payable one day after date at 8 per cent per annum." No reference is made to this particular item on cross examination.

The next loan of $1,000, June 29, 1889: Pinkus testifies as follows: "The next amount borrowed from Abe Spitzer was $1,000 at Decatur, Ala., on June 29, 1889. I also gave him my promissory note payable one day after date." On cross examination he stated: "On June 29, 1889, Mr. Spitzer paid me the $1,000 in currency. At that time Mr. Spitzer came up on a visit. I don't remember how long he had been up when I borrowed the money from him. I don't remember whether I deposited this money in bank or not, but it may be that I did." His bank account shows that he deposited on that day one item of $123, and another of $1,000. Spitzer's testimony is as follows on direct examination: "On June 29, 1889, loaned him $1,000 in cash, and he in return gave me his note payable one day after date with 8 per cent. interest." On cross examination he testified: "I. Pinkus made the arrangement with me at Mobile, Ala. for the loan of June 29, 1889, when he came down to Mobile to the soldier's encampment; he wanted four thousand dollars. I agreed to let him have this amount. I did not let him have any money there. It was a few weeks later after he came down there. I brought it to him. I paid him the money in cash. I drew it out of the Mobile bank in currency. The $1,000 was all paid to Pinkus in currency. I drew this money out of the Mobile bank some time in June. I can't remember the date." In response to a question put by complainants' counsel just following the above quoted statement, inquiring how much of that $1,000 was drawn out of the bank, and when and where did the balance come from, he replied: "I drew part of it from the bank and part of it I had at home in my safe." The witness's account with the Mobile bank shows that from June 4th, to the end of the month, he drew ten checks aggregating $219.71, the largest of which was for $46.08.

The next item, $500.37, July 3, 1889: Pinkus testifies that to the best of his recollection this was a foreign check sent by Spitzer from Mobile which he endorsed to him, Pinkus, and upon which witness's indorsement appears,

and for this loan he returned to Spitzer his promissory note, describing it. On cross examination he says: "On July 3d, 1889, Abe Spitzer paid me $500.37 by sending me a foreign check either from Birmingham or Mobile, I don't remember which. I think I deposited that check in bank with probably other amounts." His bank account shows a deposit on that day of $500.37. Spitzer testifies: "On July 3d, 1889, I loaned him $500.37 by foreign check, I think."

The next item, Aug. 7, 1889, $1,000: Pinkus testifies: "The next amount borrowed of Abe Spitzer was $1,000, paid to me by him in currency. This was Aug. 7th, 1889, and I gave him my note as the firm of Isaac Pinkus & Co. dated Aug. 7th, 1889, payable one day after date for $1000 for this loan." On cross examination he says: "Abe Spitzer paid me the $1,000 on Aug. 7th, 1889, in money. I don't remember whether or not I deposited that amount in the bank at that time, but may have done so. At that time I think he, Spitzer, came up here on a visit. I don't know whether or not it was specially a business visit to me, it may perhaps have been a visit of both pleasure and business combined. I don't know, I am not sure, but we have had correspondence, and perhaps my sister also, and J. M. Friedman too in reference to that visit." Spitzer testifies: "On Aug. 7th, 1889, I loaned him $1,000 in cash." On cross examination, he says: "I made the payment of August 7th, 1889, in cash in person. I also brought it from Mobile. I got it from the same source that I got the other. I took it in of course. I got part of it from the same bank that I got the other, and I had part of it at home. I guess I got about $500 of it from the bank." His bank account shows no check for a space of six days prior to Aug. 7. On July 30, he is charged in his bank account with $150.53, and on July 25, with $1,000, and with sundry small sums on up to July 5th, when he is charged with $500. Spitzer testifies that he had no other bank account than the First National of Mobile and Friedman's bank of San Antonio, Tex. We have no information whatever as to the state of the account in the latter bank.

This is substantially all the evidence specially touching these claims. There is much of general history shedding light upon the question of their validity, which we will narrate as briefly as possible. It can not be disputed that on March 3, 1890, and during the winter preceding, Pinkus was largely insolvent, his liabilities, according to his testimony, being nearly or quite double the value of his assets,

and that he well knew his condition; and that failure and suspension of business in the near future were invitable. About Feb'y 1, 1890, he boxed up and stored in the private warehouse of M. T. Cartwright near by, goods amounting to about $2,400, according to invoice prices. On Sunday night of March 2d, following he boxed up over $1,000 worth more of goods according to invoice price, and in the forenoon of the next day stored them in a private room up stairs in a house near by, occupied by M. B. Friedman. On January 25, 1890, Pinkus put his mother's claim in shape by executing to her his note for the money he had borrowed of her nearly two years before. On the morning of March 3, Spitzer appeared in Decatur, arriving that morning at about 2 o'clock. Appellant, Herbert Cartwright, under negotiations conceived, carried on and consummated, as claimed, by him and Pinkus, during that forenoon purchased and became the transferee of these claims of Hannah Pinkus, Spitzer and the Decatur bank, aggregating about $6,500, by giving therefor his individual notes, except in the case of the bank, who required and obtained the suretyship of appellant's father, M. T. Cartwright. Appellant was a young man about 22 years of age, had never engaged in any business except clerkships, and had no property which the evidence shows was visible or known to Spitzer or Mrs. Pinkus, although he testified he owned certain interests in real estate and stock amouting to about $5,000. Spitzer and Mrs. Pinkus made no inquiry of him as to what he was worth. On March 1st Pinkus sold to said M. T. Cartwright the said goods, which had been stored in the latter's warehouse on Feb'y 1st, to pay an alleged indebtedness of about $1,800. It is claimed that these goods were winter stock and were stored in the warehouse to be carried over to the next fall and winter trade; and this claim is supported by the testimony of clerks in the store who boxed the goods and stored them in the warehouse. Moth preventives were put amongst the goods. It happened, however, afterwards, that the value of these goods was about equal to M. T. Cartwright's claims against Pinkus, and were taken as they stood in the warehouse in full payment of those claims. On the morning of March 3d, Pinkus had book accounts against his customers amounting nominally to about $2,200, which, about ten o'clock that morning, he sold and assigned to J. M. Friedman to pay an alleged indebtedness of $1,615 due the latter. According to the testimony of Pinkus these accounts also happened to be in value about equal to Friedman's claims.

[Cartwright v. Bamberger, Bloom & Co.]

It appears, nevertheless, by the very positive and explicit testimony of M. T. Cartwright and Pinkus that the debt for which the goods were sold to the former was just, due and owing for house rent and borrowed money, and that the goods were not worth exceeding the amount of the debt; and the claim of Friedman, for which the book accounts were sold, is supported by the positive testimony of Pinkus, Friedman himself not being examined; and there is nothing to refute this testimony, except whatever circumstances of suspicion arise out of the general history of the case. It is not shown that appellant, Herbert Cartwright, had any knowledge of, or connection with, the transfer to Friedman. His testimony is positive that he knew nothing about it. The case shows that Pinkus participated with appellant in the negotiations and efforts of the latter to buy up the claims on which the attachment was, in part, founded; that, by arrangement between them, he went to the house to consult his mother about the transfer of her claim, while appellant went to negotiate with Spitzer and the bank, and, after stating to her the facts and circumstances which we will presently relate, advised her, that if Cartwright made her a reasonable offer, to let him have the claim. We are thus confronted with suspicions which certainly demand explanation. It is just that we set out somewhat in detail the explanation given by appellant which is substantially supported by Pinkus. It is about as follows: On Saturday night, March 1st, his father asked him how much Pinkus was owing him, and stated that he had made a settlement with him that day for the amount he was owing him, and had had some trouble in collecting his money, having to take goods in settlement, and that he, Herbert, had better see Pinkus as soon as possible and try to collect what was owing him; that he believed Pinkus was pressed; that it was unusual for a merchant carrying a large stock to sell goods to pay his debts that way; that he, Pinkus, had sold him these goods at less than cost. It was agreed between them that it would be best to see Pinkus the following Monday morning. On that morning appellant went to the store early and there found several boxes of goods boxed up, some of the goods lying on the floor between the counters and some in the aisle behind the counters where the clerks walk; he then asked Mr. Gray, one of the clerks, what those goods were doing packed up, who had packed them and when; and Gray replied Pinkus had packed them on Sunday night, and had told him it was a bill of goods to be shipped early Monday morning. When Pinkus reached the store appellant re-

quested a settlement of him, and he replied that he had not expected to be called on for a settlement until later in the season and asked why it was requested. Appellant told him he did not wish to have out so much money unsecured. Pinkus urged appellant to wait until fall telling him he did not need the money, and appellant replied that he did need it and needed it badly, and must have it. Pinkus then said the bank was not open, but that sometime during the day, during banking hours, he would try to make arrangements to borrow enough money to pay all or nearly all of the debt. Appellant asked him to give him a check and he would hold it up until any time during banking hours to allow him to make arrangements, just so he made them that day. He refused to give the check. Appellant then went to see his father and told him what had occurred, and about the boxes of goods, and he advised that appellant go and see if Pinkus would not sell him enough goods to settle the debt, and advised attachment if he would not do it. He then went to Pinkus and requested him to sell him goods enough to pay the debt, the same as he had done his father. This Pinkus refused to do, saying the goods he had sold the father had been stored away in the father's warehouse for some time, and he would not have needed them until the next season, but if he was to sell $3,000 worth of goods out of his stock it would cripple him so he could not pull through the season. Appellant told him if he would not do it, he would be compelled to attach him. Pinkus asked him what he had done to be attached for and threatened appellant with a suit for damages if he did attach, in reply to which appellant asked what the goods were doing packed up in the store, and when had they been packed? He replied they were packed on Sunday night, only to make room for some goods he expected to receive soon. Appellant told him he thought he knew enough to warrant attachment. Pinkus then began to beg him not to attach, saying that he could possibly borrow a thousand dollars and pay that, and if appellant would wait 60 days he thought he could pay the balance. Appellant declined to wait and Pinkus continued to beg him not to attach, saying it would ruin his business and financial reputation. Appellant still declining, Pinkus said he owed the bank in Decatur a sum of money, and his mother and also Abe Spitzer; that the bank had been kind in advancing him money; that Spitzer had been a close friend of the family, and had loaned him money on several occasions, and he felt honor bound to pay him, and that his mother had loaned him money long before to begin business on—

[Cartwright v. Bamberger, Bloom & Co.]

money she had received for insurance on his father's life—
and if he should be attached it would leave her penniless.
Appellant then asked what the claims amounted to, and how
evidenced, and what his stock of goods would amount to. He
gave the amount of the claims and how evidenced, substantially
as they have been hereinbefore described, and said the stock
amounted to between $14,000 and $15,000.  Appellant then
asked if he supposed these parties would sell their claims,
saying, if they would, he would buy them and attach for the
whole, and he replied he did not know whether they would
or not.  Appellant then told him if he would see his mother,
he, appellant, would see Spitzer and the bank, and if he
could make satisfactory arrangements with them he would
buy their claims.  Pinkus said he wanted his goods to go as
far towards paying his debts as possible, and appellant told
him he did not believe the stock at forced sale would bring
an amount more than sufficient to pay the claims mentioned
and his own.  Pinkus then said he would see his mother and
tell her of his situation and his inability to pay her and that
she might do as she pleased in the matter. Appellant went to
see Spitzer and the bank, and procured their claims.  Pinkus
went to see his mother and told her Cartwright persisted in
his purpose to attach, and that she would get nothing, and
advised that if he made her a good offer to accept it.  After-
wards Cartwright went to see her, and procured her claim.
He then attached, procuring his father and M. B. Friedman
as sureties on the attachment bond.

It has not been practicable to set out, in this opinion, all
the facts of this case in detail.  We have endeavored to give
the leading and salient facts, which it seems to us, ought to
control the decision of the cause.  Upon due discussion and
consideration of all the evidence, as we have been able to
get it from the record, a majority of the court have reached
the conclusion, that the several debts claimed by appellant
are satisfactorily established, and that no just cause exists
for setting aside the attachment.  We will not further en-
large this opinion by stating the reasons which entered into
that discussion.  We simply state the facts and the conclu-
sion upon them.  The decree of the City Court is reversed,
and a decree will be here entered dismissing the bill.

Reversed and rendered.


· STONE, C. J., *dissenting.*—About the year 1887 Isaac
Pinkus commenced business as a merchant in Decatur, Ala-
bama.  He dealt in dry goods, clothing, shoes, and, proba-
bly, other lines of trade.  In 1889, and, until March 3, 1890,

he occupied a storehouse which was the property of M. T. Cartwright, father of Herbert Cartwright. The latter, Herbert Cartwright, was born in September, 1868, and in January, 1889, he went into the service of I. Pinkus as a salesman in his store, at an agreed salary of one hundred dollars per month. He had been employed in Huntsville a part of the year 1888 at fifty dollars per month. He continued in the service of Pinkus until the goods of the latter were attached, to be shown further on. When Isaac Pinkus's stock of merchandise was attached—March 3, 1890—Herbert Cartwright was twenty-one years and six months old.

I will now proceed to state the case presented by this record, as claimed to be shown by the testimony most favorable to Herbert Cartwright:

In 1887 Herbert Cartwright was, or had been relieved of the disabilities of minority. His father had been his guardian, and then paid over to him a fraction over twenty-three hundred dollars in money. This money he kept unemployed until May, 1889, when he lent it to Pinkus. On March 3, 1890, this lent money demand had become $2,500, and Pinkus owed Herbert on his salary a fraction over $400. Total, $2,900. Pinkus had also become indebted to M. T. Cartwright, father of Herbert, in about $1,800. In this was included unpaid rent for the storehouse.

In February, 1890, Pinkus boxed up a part of his winter stock which was becoming unseasonable, and stored it in the warehouse of M. T. Cartwright. There was no concealment about this, and Herbert Cartwright had knowledge of it. These goods invoiced, at cost prices, about $2,400. On March 1, 1890, Pinkus sold this lot of goods to M. T. Cartwright at 75 cents on the dollar of their cost price. This in payment of the rent of the storehouse, which he owed him, and in payment of other debts—the whole amounting to $1,800. Herbert Cartwright knew of this sale, made as it was to his father.

Between the Saturday, when this sale was made to M. T. Cartwright, and the following Monday, March 3, 1890, the Cartwrights—father and son—had a conference in reference to the latter's claim on Pinkus. When Herbert reached the store Monday morning, he found some of the goods boxed up, and the boxes still in the store. Inquiring about this, he was informed by Pinkus that the object was to make room for other goods expected to arrive. It is not shown that the said Herbert had discovered that any goods had been carried out of the store, but the inference is that he had not. Herbert demanded that the $2,900 due him be paid, and, if not paid, threatened to attach. Pinkus im-

[Cartwright v. Bamberger, Bloom & Co.]

plored him not to attach, as it would break up his credit and business. He informed him, too, that he, Pinkus, owed his own mother some $2 200 or $2,300, for borrowed money; owed Spitzer, Pinkus's prospective brother-in-law, about $2,700, and that he owed the First National Bank of Decatur fourteen hundred dollars; all of which he desired to pay. Herbert Cartwright thereupon inquired of him if his mother, Mrs. Pinkus, and Spitzer, his friend and prospective brother-in-law, would sell their claims? Pinkus could not answer; but soon after, Cartwright was brought in contact with them, obviously through the intervention of Isaac Pinkus, and readily effected a purchase of the two claims, giving to each of them his unsecured note due at twelve months for the amount claimed to be severally due them. He also gave his note to the bank for the amount due to it, $1,400, but was required to give his father as surety on this debt, to be paid in four months.

Having thus secured these several claims, aggregating with his own demand $9,500, he sued out an attachment against Pinkus, and by 12:30 P. M. o'clock on Monday, March 3, had it levied on the entire stock of goods in the store, which, at cost prices, invoiced at about $12,000 to $14,000. The particular grounds of the attachment was that he had effects liable to the satisfaction of his debts which he fraudulently withheld.

The testimony of the two Cartwrights, father and son, proves this cash fund of twenty-three hundred dollars as belonging to Herbert, the younger. This is claimed to be the money loaned to Pinkus. Herbert testified that in March, 1890, he owned other property valued at $1,900, but none of it was money assets, or shown to have been susceptible of conversion into money.

Cartwright, the father, testified that in March, 1890, his property was worth twenty-five or thirty thousand dollars. Of this, some seventeen thousand or more was in city real estate in Decatur. It is not shown what moneys, or money secureties he held. This was the financial condition of the Cartwrights, father and son, as testified to by themselves. Pinkus is not shown to have owned any property save his merchandise, and unpaid dues for merchandise sold. He owed, in addition to the debts of which Herbert Cartwright claimed to have become the owner, some fourteen or fifteen thousand dollars, as the testimony tends to show.

One Friedman, a liquor dealer, or saloon keeper, had his place of business near to Pinkus. Pinkus, as the testimony tends to show, owed him about $1,600. Shortly before

[Cartwright v. Bamberger, Bloom & Co.]

Cartwright's attachment was sued out against Pinkus, he, Pinkus sold, and transferred the notes and book accounts due him, amounting to about $2,100, in payment of said indebtedness, Friedman agreeing that if he realized from the claims more than was due him, he would pay the excess to him, Pinkus. During the night of March 1st or 2d, 1890, Pinkus took out of his store merchandise, consisting of shoes, of the invoice-cost value of about $1,400 or $1,500, and secreted them in the upper room of Friedman's saloon. The fact of this withdrawal and secretion, however, was not known to Herbert Cartwright, as he testifies, until after his attachment was levied. Still, Friedman became and was one of the sureties on the attachment bond of Herbert Cartwright, when he attached the goods of Pinkus March 3, 1890.

At the time Pinkus's store was broken up by Cartwright's attachment, Henry Clayburn was the porter in the store. He was made a witness by Herbert Cartwright in this suit. In his cross examination he gave this testimony : "I was usually about the store all day. The reason that I was not about the store that day, because it was late when I got there, and he told me to go to my breakfast; and when I went to breakfast, his mother told me they would not need me at the store that day. When Mr. Pinkus told me to go to my breakfast, I don't know whether he had been to his breakfast or not. I can't tell what was the usual time they had breakfast. When I first went to the store that morning I saw no one but him, Mr. Pinkus." There were no objections or exceptions to this testimony, although if objected to, the legality of what Mrs. Hannah Pinkus said to the witness is not perceived.

It is manifest the witness was speaking of what took place on March 3, 1890, the day on which the Cartwright attachment was sued out and levied. And when he was told by Pinkus to go to his breakfast, only Pinkus was there. Considered in connection with the other testimony, the conclusion is rational, if not positive, that this took place before Herbert Cartwright reached the store that morning, and consequently before he demanded his money from Pinkus, and threatened to attach him, as he testifies he did. If so, is not this a circumstance—a pregnant circumstance—tending to show that the attachment was determined on before Herbert reached the store that morning, and that Herbert and Pinkus so understood it? Else, why hurry off the porter to breakfast, and why should, or could he be told his services would not be wanted at the store that day? Does

[Cartwright v. Bamberger, Bloom & Co.]

this not show a common understanding, a common purpose? And, in this connection, may we not inquire how it happened that Spitzer, whose business habitation was Mobile, arrived in Decatur that morning?

In giving his testimony in this case, Herbert Cartwright was interrogated as to his motive in purchasing the claims from the bank, from Mrs. Pinkus, the mother of I. Pinkus, and from Spitzer? His answer was: "By purchasing an amount of claims equal to what I thought the stock of Pinkus & Co. would bring under an attachment sale, which amount I knew would be less than the actual cost of said goods, and therein I thought would be a good opportunity for speculation. · · My object in buying the claims of Mrs. Hannah Pinkus, Abe Spitzer and the First National Bank of Decatur was to get possession of the stock of goods of I. Pinkus & Co., as I had an idea of going into business for myself. I believed this was a good opportunity, · · and thought that I could make a thousand or so dollars by buying this stock under an attachment sale."

M. T. Cartwright, father of Herbert, gives substantially the same reason the son gave, for buying the additional claims against Pinkus. And Spitzer testified that while Herbert Cartwright was negotiating for the purchase of his claim, in reply to the inquiry why he wished to purchase, he replied, "He wanted to buy up as many claims against Pinkus as possible, so that when his stock of goods was sold under attachment, he could buy at reduced prices."

Is it not extraordinary, if Herbert Cartwright and Pinkus were dealing with each other at arm's length, as a creditor exacting payment, and a debtor imploring forbearance, that this statement should have been made by Herbert Cartwright to Spitzer?

When the goods were sold under the order of court, Herbert Cartwright became the purchaser of the stock of goods, sold in gross, at 40 per cent discount from their original cost prices. In other words, he paid sixty cents on the dollar of the sum Pinkus had paid or promised the wholesale merchants for them. They cost Herbert something over $8,000, as I understand the testimony; but the goods which had been previously purchased by M. T. Cartwright appear to have been included in this sale. Herbert Cartwright, the purchaser, paid the purchase price, which has ever since remained in the court, subject to the final disposition of this cause. If I am mistaken in the amount thus paid into the registry of the court in the purchase of the goods, there can be no question that the sum, independent of the proceeds of

41

[Cartwright v. Bamberger, Bloom & Co.]

the goods claimed to have been purchased from Pinkus by M. T. Cartwright, exceeded materially the sum of six thousand dollars. This large sum, according to the contention of appellant, was paid into court by him, when he purchased the goods, and has lain there ever since. In addition, he shows, by his own testimony, that he paid the $1,400 to the First National Bank when it matured, and in September, 1890, settled with Mrs. Pinkus, the mother, paying her then $2,000, the residue being remitted, in consideration of payment before maturity. He also paid Spitzer $500 on his claim. These sums added together make a gross sum of ten to twelve thousand dollars paid out by Herbert Cartwright, and of the use of which he has been entirely deprived during all these years, while it is not shown that he has had any profitable or available use of his own means. His original claim of $2,900 against Pinkus has been locked up in the litigation, and it is thus shown that he has had no use or control of it. From what source has he been able to meet these heavy drafts? True, he testifies that he borrowed the most of the money with which he paid for the goods which are the subject of contention in this suit; but borrowed money debts, like other debts, will mature, and, as a rule, must be provided for.

We think it clear that the debt, $1,400, to the First National Bank, is sufficiently proved to be *bona fide*. The proof is also satisfactory that Pinkus had owed his mother about the sum claimed to have been due her. She had to be supported, however, and the conjecture would be reasonable that she had found it necessary to draw somewhat on that fund. But I do not make this a special ground for an opinion. I do, however, invite special attention to the claim of Spitzer. The proof of the *bona fides* of that debt is far from satisfactory; and the fact that he had not, when his testimony was taken, collected exceeding $500 of the $2,700 he claims to have sold to Herbert Cartwright, is itself a suspicious circumstance. He owed no courtesy, or forbearance, to Herbert, if, as contended for, he simply sold his claim, as a means of saving it from loss; selling it, as he did, to the man who was taking steps to bring Pinkus, his friend and prospective brother-in-law, to bankruptcy and ruin.

Let us consider another question, as shown in the testimony in this record. Herbert Cartwright, in purchasing other claims against Pinkus, assumed the burden and risk of proving those claims to be just. This, on the plain principle that dealing with a debtor in failing circumstances—known to be in failing circumstances—the law permitted

[Cartwright v. Bamberger, Bloom & Co.]

him to use all lawful means to secure the collection of his own claim, even though in doing so he deprived all other creditors of the means of collecting their demands. But his authority extended no farther. He must simply collect his own claim, depriving the other creditors of no greater amount of the assets of their common debtor, than was reasonably necessary for such purpose. He must not secure any benefit to the debtor, and must not secure to himself any thing in excess of the sum due him. If he go beyond this permissible boundary he perpetrates a fraud. And we may take another step. The facts of this case are so extraordinary—so entirely without the routine of ordinary business transactions—that fuller and more satisfactory proof is required to uphold such transaction.—*Borland v. Mayo*, 8 Ala. 104; *Lehman v. Kelly*, 68 Ala. 192; *Lipscomb v. McClellan*, 72 Ala. 151; *Barnard v. Davis*, 54 Ala. 565; *Hubbard v. Allen*, 59 Ala. 283; *Hamilton v. Blackwell*, 60 Ala. 545; *Harrell v. Mitchell*, 61 Ala. 270; *Thomas v. Rembert*, 63 Ala. 561; *Donegan v. Davis*, 66 Ala. 362; *Tryon v. Flournoy*, 80 Ala. 321; *Gordon v. McIlwain*, 82 Ala. 247; *Shelley v. Tardy*, 84 Ala. 327; *Lehman v. Greenhut*, 88 Ala. 478; *Cartwright v. Bamberger*, 90 Ala. 405; 8 So. Rep. 264.

I trust I will be pardoned for grouping what appear to me to be the uncontroverted, salient facts of this case. A young man, just six months past the period of his majority, is the owner of $2,900—no more—of available assets. He claims to own other property worth something less than two thousand dollars; but he furnishes neither proof nor presumption that his other property is in such shape as to be available for commercial purposes. His $2,900 is not in his possession, but is due to him from his employer, who is a merchant, engaged in trade. Becoming alarmed for the safety of this sum of $2,900 due from his employer, on Monday, March 3, 1890, after breakfast time on that day, as I think the circumstances show, he approaches his employer with a view of collecting or securing his claim. Is informed by Pinkus, the debtor, that the latter owes his own mother twenty-two or twenty-three hundred dollars, and to Spitzer, his friend and prospective brother-in-law, twenty-seven hundred dollars, which he desires to pay. Also, that he owes the bank fourteen hundred dollars, which he wishes to pay also. That through Pinkus, as mediator, he procures himself to be brought into communication with the mother and future brother-in-law of the latter, and purchases their claims, apparently without evidence of their *bona fides*, for their face value, promised to be paid without condition at the end of

twelve months; that these claims are readily sold to him, Herbert Cartwright, with knowledge that the latter's object in making the purchase was to make them the foundation for an attachment against Pinkus, the son of the one and the friend of the other, by which the latter's goods were to be seized and sold at a sacrifice, and his business broken up; that, with the same end in view, he, Herbert Cartwright, purchased, at its face value, the claim of fourteen hundred dollars due from Pinkus to the bank, and secured its unconditional payment to the bank in four months. That, securing the control of these claims, he, Herbert Cartwright, sued out an attachment, charging fraud against Pinkus, and had his entire stock of merchandise seized thereunder. And, according to the testimony of Herbert Cartwright and his witnesses, all this was conceived, determined upon and executed within little, if any, more than four hours.

There are other strange features of this transaction which should not be overlooked. Friedman is shown to have been the friend of Pinkus. He permitted the latter to secrete some of his goods in his, Friedman's business house. Yet, he became one of the sureties of Herbert Cartwright on his bond for the attachment, under which the goods of Pinkus were seized. Was not this a strange spectacle? Mother and prospective brother-in-law agreeing at once to sell, and actually selling, without delay or reflection, as it would seem, claims against the son and future brother-in-law amounting to $5,000, with the knowledge that an attachment was to be immediately issued for their collection, whereby the son and brother-in-law would be broken up; and the trusted, if not the best friend of the latter contributing to the result, by becoming surety on the attachment bond. Were not these extraordinary attendants of an attachment for the enforcement of a debt? and all the more extraordinary, when it is clearly proven that the debtor himself aided in having the transfer of the claims made, which led to the attachment?

Another circumstance should be noted. The notes, $1,40 ', which Herbert Cartwright purchased from the bank, were what are known as waive notes. They expressed on their face that the debtor waived his exemptions as to personalty. The personal exemption under our statute is one thousand dollars in value, and a waiver, thus expressed, operates as a bar to such exemption, so far as the debt is concerned. Yet, although this litigation has been pending for more than three years, and although the goods attached did not sell for enough to pay what is claimed by Herbert Cartwright to

[Cartwright v. Bamberger, Bloom & Co.]

be due him, he has taken no step to bar or cut off Pinkus's exemptions of personal property.

Nor must another important inquiry be overlooked. As I have shown, Herbert Cartwright's available effects—$2,900— were locked up in this litigation. So has the money for which the goods were sold under the attachment been kept in the registry of the court. The money paid to the bank, to Mrs. Pinkus and to Spitzer was $3,900. In the purchase of the goods, as the record shows, Herbert Cartwright had to pay an additional six or eight thousand dollars. Of none of this has he since had the use. In what way has he been able to command and control this large sum of money? The record does not satisfactorily inform us. It is manifest that the proof falls far short of showing that the father did or could supply the requisite funds.

I have grouped these facts because they show how utterly improbable it is that this was a simple, *bona fide* attempt by a *bona fide* creditor to collect a debt due him. They tend very strongly to show:

First, that there was collusion; and this generates a strong suspicion that Pinkus was to be benefitted by the collection of the alleged debts to his mother and to Spitzer.

Second, that by these extraordinary proceedings, Herbert Cartwright attempted to collect, not alone the debt alleged to be due him, but a large profit beyond that, which must necessarily be at the expense of other creditors.

Third, that this transaction is surrounded by so much that is unusual—so much that is suspicious—that it should require a strong, clear showing—much more convincing than is found in this record—to uphold it against the assault of creditors.

The City Court, after what appears to have been a very careful consideration of the testimony, employed the following language, which I consider eminently just and proper:

"The complainants, having assailed the attachment for fraud and having shown to the satisfaction of the court that it was sued out in collusion with Isaac Pinkus & Co., and having proven the existence of their debt against said Isaac Pinkus & Co., at the time of the attachment, the *onus* is on defendant Herbert Cartwright to establish the *bona fides* of the several debts which constitute the consideration of his attachment; and complainants having further alleged and shown to the court's satisfaction that said defendant was the chief clerk of said Isaac Pinkus & Co., and as such entrusted with the general supervision of the business, especially in the absence of Isaac Pinkus, and a large part of his alleged debt having been purchased from the mother

and contemplated brother-in-law of said Isaac Pinkus, exciting just suspicion of the fairness of the transaction, he is required by the law to produce clearer and more convincing proof of the good faith of the transaction and of the adequate and valuable consideration, than if this relationship did not exist. All the facts and circumstances taken together show a collusive attachment and a conspiracy to defraud the creditors of Isaac Pinkus & Company. A collusive attachment sued out for fraudulent purposes stands upon the same footing as a fraudulent conveyance, and the defendant's measure of proof must come up to the standard the law requires in such cases.

"The court has given this case much careful and patient study, and, considering all the legal evidence submitted, the court is forced to the final conclusion that the attachment, which is here sought to be set aside, was the result or outgrowth of the unlawful combination charged in the bill ; that there was no real ground for an attachment as between Herbert Cartwright and Isaac Pinkus ; and that Isaac Pinkus knew of and connived at the attachment ; and that it was sued out with the intent to use it to affect and prejudice the pre-existing rights of the *bona fide* creditors of said Isaac Pinkus & Company ; that the *bona fides* of none of the claims going to make up the total debt of Herbert Cartwright, upon which the attachment was based, (except that of First National Bank) has been shown by the measure of proof required by law ; and further that in the purchase of the claims of Hannah Pinkus and Abe Spitzer the said Herbert Cartwright went 'beyond the permissible purpose of securing his own claim,' his declared purpose being to get more than was necessary for his own indemnification; he thus 'put himself outside of the pale of the law's protection from the just demand of other creditors ;' his whole and only purpose was evidently not the payment of his own debt ; he went beyond the boundary of the reward and protection which the law gives the vigilant creditor. This had the effect to hinder or delay other creditors or to impair their rights. The circumstances attending the attachment were so unusual that the conclusion is irresistible that Pinkus had something to do with it, and that his purpose was to hinder or defraud his creditors ; and the circumstances attending the purchase by Cartwright of the claims against Pinkus were so unusual that they show a willingness on his part to aid, and that he did aid said Pinkus in defeating any efforts that were made, or might have been made, by other creditors to obtain satisfaction of their demands."

My opinion is that the decree of the City Court ought to be affirmed.