# Thompson v. Tower Manufacturing Co. *et al.*

*Bill in Equity by Creditors of an Insolvent Debtor to vacate a Sale by him to his Mother, as Fraudulent and Void.*

1. *Bill to vacate fraudulent conveyances by insolvent debtor to his mother; burden of proof.*—Where in a bill filed by creditors of an insolvent debtor to have vacated and set aside as fraudulent a conveyance by him to his mother of the bulk of his property, on the recited consideration of payment of an indebtedness for borrowed money, it is averred that the alleged consideration for the sale was largely, if not wholly, fictitious and simulated, that the value of the property conveyed was greatly in excess of the amount mentioned in the deed, that the mother never had in cash the sum alleged to have been borrowed, and she never loaned the debtor such sum, that the execution of the conveyance was a fraud against the creditors, was designed and executed for the purpose of hindering, delaying and defrauding complainants and other creditors, and that the grantee accepted the conveyance with full knowledge of the insolvent condition of her son and of his purpose in making the same, the burden is upon the mother, the grantee in the conveyance, to show, first, by a full, explicit and direct answer, and, then, by proof of the same character, that the sale to her was a *bona fide* sale in payment of a valid, subsisting indebtedness actually owing to her by her son, not materially less in amount than the fair cash value of the property sold; and to meet this requirement she must show clearly that she had the means, and how she acquired them, to make the alleged loans.

2. *Same; insufficient evidence.*—On a bill filed by creditors to set aside as fraudulent and void a conveyance by their insolvent debtor to his mother, on the recited consideration of the payment of a prior indebtedness to her, alleged to have arisen from a number of loans made by her to him within a few years, for the purpose of showing the existence of such indebtedness and that the loans were actually made, the father of the debtor, in his testimony, set forth an irregularly stated list of the alleged loans, but there was no evidence as to where this list came from, or what knowledge the witness had of its correctness, or what account of the loans, if any, was kept and by whom; and the testimony of the debtor and his mother, in this behalf, was a literal adoption of that of the father. Although it was shown that the father and mother did their business through banks, yet they both testified that not a check was drawn in making any of the loans to their son; nor was it shown that any receipt was ever taken, note

[Thompson v. Tower Manufacturing Co.]

executed or account kept between the debtor and his mother. *Held:* such evidence does not show the existence of the alleged prior indebtedness, to support the conveyance.

APPEAL from the City Court of Anniston, in Equity.

Heard before the Hon. JAMES W. LAPSLEY.

The bill in this case was filed on April 19, 1889, by the appellees as contract creditors of V. L. Thompson, for the purpose of having set aside, and declared as fraudulent and void, a bill of sale executed by said V. L. Thompson to C. A. Thompson, his mother, on January 3, 1889.

The facts of the case are sufficiently stated in the opinion.

Upon the final submission of the cause, on pleadings and proof, the chancellor decreed that the complainants were entitled to the relief prayed for, and declared that the bill of sale from V. L. Thompson to C. A. Thompson, dated January 3, 1889, be declared fraudulent and void, and that C. A. Thompson be declared to be a trustee for the complainants to the extent of the value of the property conveyed by said bill of sale. The respondents in said cause appeal from this decree, and assign the rendition thereof as error.

KNOX, BOWIE & PELHAM, for appellants.—The principles of law governing cases of this sort are so well settled in this State, and are so familiar to the court, that much discussion on this point is unnecessary. It is important, however, in applying to the facts of the case, any of the decisions that may be referred to on either side, for the court to keep well in mind the distinction often referred to, between a case like this, where a creditor buys in extinguishment of an existing debt, and one where a stranger purchases from an insolvent debtor. In the latter case, if the debtor be insolvent and makes the sale to hinder, delay or defraud his creditors, and the grantee knows of his insolvency, or is acquainted with facts sufficient to put him on inquiry, the sale will be set aside as fraudulent against creditors, without regard to the good faith of the grantee. But, on the other hand, where an insolvent debtor sells goods to an existing creditor at a fair valuation, in payment of his debt, the sale is valid, notwith-

standing both the grantor and the grantee deliberately intended to defraud all other creditors.—*Carter Bros. v. Coleman*, 84 Ala. 256; *Wood v. Moore*, 84 Ala. 253; *Knowles v. Street*, 87 Ala. 357, and the many authorities cited.

It is wholly unnecessary for the vendee of the goods to sustain by positive proof, or in fact by any proof, every item of her account. If the decisions in this State mean anything, it is established beyond all controversy that without regard to the intent of the vendor or the vendee, it is only necessary that a *bona fide* existing indebtedness should be shown, at least equal, or not greatly less, than the market value of the goods at the time of the purchase. What the court will look for, and all the law requires, is a substantial consideration passing from the vendee to the vendor in the satisfaction of an existing indebtedness, not greatly less than the market value of the goods, and which reserves no benefit to the grantor.—*Wood v. Moore*, 84 Ala. 253; *Knowles v. Street*, 87 Ala. 357; *Carter v. Coleman*, 84 Ala. 256; *Chipman v. Stern*, 89 Ala. 207; *Mobile Sav. Bank v. McDonnell*, 89 Ala. 434; *Hornthall v. Schonfeld*, 79 Ala. 107; *Harmon v. McRae*, 91 Ala, 401; *Smith v. Collins*, 94 Ala. 394.

J. J. WILLETT, and CASSADY, BLACKWELL & KEITH, *contra*.—The transaction attacked by the bill in this case, being between mother and son, must be scrutinized more closely than it would be between strangers.—*Calhoun v. Hannan*, 87 Ala. 277; *Bell v. Kendall*, 93 Ala. 489; *Hubbard v. Allen*, 59 Ala. 283.

Although it may appear that Mrs. Thompson did advance V. L. Thompson some money or property, yet it is apparent that she did not advance him the large amount claimed, and that there was actual fraud in the sale, and hence it will not stand as security for any amount advanced him.—*Ruse v. Bromberg*, 88 Ala. 629; *Gordon v. Tweedy*, 71 Ala. 203; *Caldwell v. King*, 76 Ala. 156.

Although Mrs. Thompson may have advanced V. L. Thompson some money or property, yet the account was wrongfully and fraudulently swelled by the inclusion of improper items, for the purpose of covering the fair and reasonable value of the property, and this destroys the

whole conveyance.—*Lehman, Durr & Co. v. Greenhut,* 88
Ala. 478 ; *Harris v. Russell,* 93 Ala. 59.

The burden of proof was on Mrs. Thompson to show
her ability to make these payments.   We had denied
that the payments were made, in the original bill, and
in the original bill we not only questioned, but denied,
her ability to make these payments.   The affirmative of
the proposition was on her; the negative was incapable
of proof.   The law on this subject is well settled in Ala-
bama.   In fact, the law could not be otherwise, as no
man can testify to what another man has or has not,
which he has never seen.—*Harrell v. Mitchell,* 61 Ala.
270 ; *Pickett v. Pipkin,* 64 Ala. 520.

HEAD, J.—On January 3, 1889, Von. L. Thompson,
then engaged in the book, stationery and printing busi-
ness in Anniston, Ala., sold and conveyed to his mother,
C. A. Thompson, the bulk of his stock of goods, and as-
signed the residue of his assets to J. H. Nunnelee, as
trustee for the benefit of his creditors.   The recited con-
sideration of the deed to his mother was its acceptance
by her in payment of an indebtedness of $8,977.20, bor-
rowed money ; $980, due her for the board of certain
hands employed in the printing office, and $360 for house
rent.   At the time of this sale, V. L. Thompson was in-
debted to the complainants and others, for merchandise
purchased during the year 1888, amounting to about
$14.000.   The complainants file the bill to vacate the
sale to the mother, as fraudulent.   It avers that the al-
leged indebtedness mentioned as the consideration of the
sale was largely, if not wholly, fictitious and simulated,
that the goods delivered were greatly in excess, in value,
of even the amount mentioned in the deed, and that the
execution of the instrument was a fraud against the
creditors and was designed and executed for the purpose
of hindering, delaying and defrauding complainants and
other creditors, and not for the purpose of paying off any
just demand from V. L. Thompson to his mother, and
that she accepted said instrument and the property con-
veyed therein with a full knowledge of the condition of
her son and his purpose in making the same.   It is fur-
ther averred that C. A. Thompson has not had, since
the manhood of her son, the sum of $8,977.20 in cash,
and has never loaned him any such sum ; and that the

other sums mentioned in the bill of sale were equally without foundation. Mrs. Thompson and her husband, J. D. Thompson, removed to Anniston from Union Springs, Ala., in April, 1885. In 1886 and to April 1, 1887, her son, then twenty-two years old, beginning with a capital, as he says, of about $60, carried on a small milk-shake and news stand. At the latter date, April 1, 1887, he purchased a stock of books, stationery, &c., at the price of $4,683.50, and thereafter carried on the book and stationery business, adding to it, some time in 1888, a job printing office. On January 3, 1889, when he sold out to his mother, he had on hand goods amounting, at cost prices, according to his answer to the bill, to about $11,500, to $12,000. The goods sold to his mother invoiced at $9,583.

Upon this statement of the case, without more—with the consideration of the sale challenged by the bill, in the manner stated—it was incumbent upon Mrs. Thompson, thus dealing with her son, to clearly satisfy the mind of the chancellor, first, by full, explicit and direct answer to the bill, and, next, by proof, of the same character, that the sale to her was what it purported to be—a real sale in payment of a valid, subsisting indebtedness actually owing to her by her son, not materially less in amount than the fair cash value of the goods sold; and to this end, the chancellor should have required her to show clearly that she had the means, and how she acquired them, to make these large advances to a son just setting out, as he did, and whose ventures, under the eyes of herself and husband, so soon terminated in such disastrous results. We can conceive of nothing simpler or easier for her to do, if it were true that she made the alleged advances, then to show clearly and in detail, and to the mind's entire satisfaction, when and where she obtained the money, and that her condition and ability were such as enabled her to make them. On the contrary, the difficulty of an undertaking on the part of creditors to prove fully and directly that she did not have the means, will be readily appreciated. The means of proof being in her hands, she should have been required to use them. This principle pervades past decisions of this court on the subject.—Calhoun v. Hannan, 87 Ala. 277; Hubbard v. Allen, 59 Ala. 283; Bell v. Kendall, 93

[Thompson v. Tower Manufacturing Co.]

Ala. 489; *Cartwright v. Bamberger, Bloom & Co.*, 99 Ala. 622; *Harrell v. Mitchell*, 61 Ala. 270.

The case of *Cartwright v. Bamberger, Bloom & Co.*, 90 Ala. 405, was a bill in equity by creditors of an insolvent merchant to set aside an attachment levied upon the goods, as collusive and fraudulent. Cartwright, who sued out the attachment, was not related by blood or marriage to the insolvent, but sustained peculiarly intimate and confidential relations to him. His answer to the bill, setting up the validity of his claims upon which the attachment was based, was general. This court, speaking through Judge Somerville, said : "The defendant Cartwright's answer to the bill nowhere explains with sufficient certainty the consideration of the large debt which he claims to hold against the defendant in attachment, the very execution and *bona fides* of which were challenged by the complainant's bill. It was charged that this demand was largely simulated—having no reality of existence except in appearance merely—except for a very small sum. The answer should have met the charge fairly and without evasion. The matter must have been within the knowledge of the claimant. He should not only have denied the fact of the alleged debt being feigned, and have asserted the valuable character of the consideration, but he should have stated fully and without evasion, the nature of such consideration, whether it was for money loaned, labor done, for goods or other property sold, or otherwise, and the particular nature and kind of service or property, if any. The answer, in this particular, to say nothing of other defects in its averments, was insufficient to justify a dissolution of the injunction."

The case of *Harrell v. Mitchell*, 61 Ala. 270, *supra*, though a case of a sale upon a present cash consideration, in which the actual payment of the alleged consideration and ability of the purchaser to make it were disputed by existing creditors, is not unlike the present, in the principle we extract from it. Brickell, C. J., said in that case : "It is so easy for parties standing in the relation of grantor and grantee to feign a consideration for the transfer of the property of the one to the other, and to fabricate the evidence of its payment, that the transaction cannot be sustained, unless it is shown that there was a real adequate consideration actually paid;

[Thompson v. Tower Manufacturing Co.]

and whatever there may be not in the ordinary or usual course of such transactions, should be fully explained. When, as in the present case, the consideration is large, amounting to several thousand dollars, there should be clear proof by the vendee, if his ability to purchase is questioned, of his means, or of the source from which he obtained the money. The absence of evidence of the disposition made by the grantor of the money it is alleged he received, becomes a material circumstance. Clear evidence of ability to make the purchase is vital to sustain the transaction against creditors whose right to appropriate the property of the grantor to the satisfaction of their demands is clear and founded on law and good conscience. * * * * It may be, the vendee had accumulated some money, but his evidence of the source from which he obtained the money paid the vendor in the presence of witnesses, is too vague and indefinite to support a transaction attended with the *indicia* of fraud which attend the conveyance to him. Where the money had been kept, if he had it on hand for any length of time prior to the purchase, could have been easily proved. Or, if not on hand, and it was obtained for the purpose of making the purchase, the persons from whom he obtained it ought to have been examined. Some clear, satisfactory evidence that it was his money, not mere general statements as to the business in which he had been engaged, and the profits derived from it, it was his duty to have given." While the distinction must be kept in mind between a sale upon a present consideration and one in payment of existing indebtedness—the latter being sustainable without regard to the intent of the parties as to other creditors, if the indebtedness is real and the property sold not more than its fair equivalent, in value, and no benefit is reserved to the grantor, while the former is not, if there was an intent to defraud creditors participated in by both parties—yet the principles stated in the above extracts touching the fact of payment of the consideration, and the requirements of proof in that regard, apply alike whether the sums claimed to have been advanced by the vendee were advanced prior to the purchase, thereby constituting an existing indebtedness, or paid at the time of the purchase. Thus limited, there is no sound reason for a distinction between the two cases. We cannot properly look to the

case of *Reeves v Skipper*, 94 Ala. 407, referred to by appellant's counsel, for the enunciation of rules touching the measure or degree of proof required from the standpoint of the chancellor, or this court sitting as his substitute, trying the question of fact in cases like the present. That case was a trial at law before a common law jury. The line which separates the functions of the judge from those of the jury in such trials, need not, at this late day, be defined. In no case can the judge tell the jury what degree of proof is required to satisfy their minds of the existence of a particular fact. The jury are the exclusive judges of the facts. It has never been laid down as an abstract rule of law that the mind cannot be made satisfied, in any case, of the validity and *bona fides* of a purchase, against the claims of attacking creditors, without proof of the source of the purchaser's means of payment; hence, for a judge to instruct the jury that such proof is required would be to invade their province. That is what was attempted in *Reeves v. Skipper*, and what we said could not be done. But, no one would question the weight and potency of an argument before the jury, in behalf of the attacking creditors, that such proof had not been made by the purchaser. Well might the jury, as well as the chancellor, find their minds unsatisfied, if such evidence be not adduced. Yet, when it is remembered that they are the exclusive judges of the facts, and that when there is any evidence, however slight, tending to prove a particular fact, it must be left to them to say whether their minds are satisfied or not, they might be satisfied, in a case like this, without the proof in question. It must be left to them alone to determine.

Guided by the principles we have announced let us examine the present record. We have stated substantially what the bill charges in reference to the consideration of the sale in question. C. A. Thompson and V. L. Thompson filed a joint answer. This answer, after reciting alleged embarrassments of V. L. Thompson during the year 1888, employs about the following language, touching the creation of his indebtedness to his mother : "From time to time respondent had gotten relief from his financial embarrassments by calling upon his mother, C. A. Thompson, who had considerable means, and who usually responded by assisting him whenever it was

necessary." Again, in another place, that said indebtedness, "was not an alleged indebtedness, but was a *bona fide* honest indebtedness, for moneys advanced and properly due from said V. L. Thompson to C. A. Thompson, and will be more fully explained in the subsequent paragraph of this answer." Again, in another place: "That it is wholly false and untrue that any part of said indebtedness * * * is simulated or ficticious, or that the goods, wares, merchandise sold by said V. L. Thompson to pay said indebtedness were to any extent in excess, in value or amount, of said indebtedness. That said C. A. Thompson, who is the mother of said V. L. Thompson, was and is a woman of considerable means, possessing in her own right improved and unimproved property in the city of Anniston valued at from twenty-five to thirty thousand dollars. That she has always enjoyed a good income from this property. That she is and has been for a number of years the owner of the Commercial Hotel in the city of Anniston, valued at $20,000, for which she has several times been offered from $17,000, to $18,000, and has refused it. That said property has never yet yielded her less than one hundred dollars per month, and has for considerable portion of that time yielded her as much as three hundred dollars per month. That she owns valuable property on Quintard Avenue in the city of Anniston, and also property in Oxanna. That she has advanced money to her son, V. L. Thompson, from time to time, to assist him in his business. That all of said money was not advanced at one time, but that the aggregate of said indebtedness is the result of different loans made at different times during the years 1887 and 1888." Again: "In addition to the borrowed money above mentioned, said V. L. Thompson was indebted to said C. A. Thompson for house rent that had remained unpaid for some time; he not being able to pay the same on account of his financial embarrassment. Said V. L. Thompson was also indebted to respondent, C. A. Thompson, for boarding a large number of hands who worked in the job printing office, no part of which has been paid." Again: "That it is true as there (in the bill) stated, as respondents now recollect, that respondent, C. A. Thompson, did not have during the period mentioned as much as $8,977.20 in cash, at any one time, but it is wholly untrue that

she did not, during the period of time mentioned in the preceding paragraph of this answer, (the years 1887 and 1888), loan to V. L. Thompson that amount of money. Said sums of money were advanced to V. L. Thompson from time to time relieving him from financial distress, and that said C. A. Thompson was able to advance the same, and the aggregate of said indebtedness is the amount recited in the bill of sale attached to the said bill of complaint." The foregoing extracts comprise all the answer states in relation to the creation of said indebtedness. Though oath was waived, it was voluntarily sworn to by V. L. Thompson and C. A. Thompson. With the best analysis of which this indefinite account of when and how the alleged indebtedness arose is capable, we find there were three sources from which Mrs. Thompson's means of becoming the creditor she claims to have been were derived. 1. From rents of her property in Anniston. 2. Rent of a house, owing her by her son. 3. Board of her son's employés. The answer gives no indication of the amount realized from either source. We do not know from it, how long she had owned the property in Anniston, during what time the rents had been coming in, nor the amount, yearly or monthly, of such rents, except that the property never rented for less than $100 per month and for a considerable portion of the time for $300 per month. The other two items or sources are equally indefinite. Having undertaken to set out Mrs. Thompson's property and income it must be taken that all is set out. What expenses, if any, had to be met, from this income, are not referred to. Taking the case then where the answer leaves it and the showing is unsatisfactory.

But let us pass from the answer to the evidence, and see if a better case has been made. Here we find new claims advanced not hinted at in the answer. Instead of these alleged advances having been made to relieve the son's financial embarrassment and distress, into which he had fallen in the prosecution of his business, we find that the largest item consisted in the sale to one Binford on the 1st of April, 1887, of a third interest in some land in South Anniston claimed to belong to Mrs. Thompson, but the title to which was in her husband, J. D. Thompson, at the price of $3,000, in part payment of the $4,683.50, the price of the stock of books, station-

ery., &c., that day purchased from Binford by V. L. Thompson, and with which he then began the book and stationery business; also $800, which it is claimed Mrs. Thompson, on that same day, let her son have, in the shape of notes on one Olmstead, on which, it is claimed, he collected the money; and further the sum of $660 in cash on the same day. This was April 1, 1887. Prior to that time he had carried on very successfully his little milk-shake and news stand. Of the balance of the $4,-683.50, the price of the stock of books &c., after deducting the $3,000., the price of the land, V. L. Thompson paid Binford $200 in cash, which he had accumlated in his prior business, and gave him his seven monthly notes for $200 each, and one note for $83.50. This, we say, was the beginning of the real business. It is now further claimed, not mentioned in the answer, that she advanced him, prior to this transaction, to-wit, during the year 1886, and up to April 1, 1887, while he was carrying on the milk-shake and news stand, the sum of $2,-480. Thus we have an advance of $6,940 before the business began, which it is said brought on the financial distress of V. L. Thompson. From April 1, 1887 to January 1, 1888, it is claimed $1,425 were advanced, and during the year 1888, the sum of $3,815. The sum of $980 is claimed, as in the answer, for board of hands, $360 for house rent, and the claim is now brought forward, not referred to in the answer or bill of sale, of $360 for the wages of a minor son of Mrs. Thompson. The sum total thus advanced from May 1, 1886, to January 1, 1889, a period of two years and eight months, is $13,880. Of this debt it is claimed V. L. Thompson paid, prior to the sale to his mother, the sum of $3,562.80, leaving due her at the time of the sale $10,-317.20. We have no information whatever as to when or how this $3,562.80 was paid, except the following indefinite statement of V. L. Thompson: ''Of the above indebtedness there is a credit of $3,562.80, money that I paid back to mother at times that she wanted it. I paid some of it to her, some to John Noble, Jr. and Sr., others of it to O. H. Parker, some of it for taxes on her property and for repairing the same.'' It cannot fail to strike the mind just here as somewhat remarkable, when we notice the care and particularity which the draftsman of the bill of sale observed to set out specifically

the different kinds of consideration supporting the sale, that no mention is made in the instrument of the $3,000 land transaction, nor the $360, said to be owing the minor son for wages, but these items, if in mind, at all, were denominated borrowed money. Why were the items of board furnished hands and rent of a house any the less borrowed money? But it would be less remarkable if the sworn anwser had given any intimation of these transactions. Unfortunately, it does not. On the contrary, it attempts only to make the case foreshadowed in the bill of sale    It insists on the claims for board of hands and house rent, but emphatically avers that the remainder, $8,977.20, was for borrowed money. Notice the language : "That it is true as there (in the bill) stated, as respondents now recollect, that respondent, C. A. Thompson, did not have, during the period mentioned, as much as $8,977.20 in cash, at any one time, but it is wholly untrue that she did not, during the period of time mentioned in the preceding paragraph of this answer (the years 1887-1888) loan to V. L. Thompson that amount of money. Said sums of money were advanced to V. L. Thompson from time to time relieving him from financial distress, and that said C. A. Thompson was able to advance the same, and the aggregate of said indebtedness is the amount recited in the bill of sale." We cannot well suppress the conviction that the draftsman, when he drew the bill of sale, and counsel, when they prepared the answer, had received no information touching these land and wages transactions. We will notice further on how they are approached and developed in the evidence.

We have seen what account the answer gives of the sources of income which, it is said, enabled Mrs. Thompson to make these advances to her son. We gather from the evidence, substantially, the following history. C. A. Thompson, and her husband, J. D. Thompson, and their family removed from Georgia to Union Springs, Ala., sometime in 1879. While there, whether the whole time or not we are not advised, they carried on the hotel business. The witnesses, viz., her husband, her son and herself, say that she carried on the hotel business, but it does not appear that he, the husband, was engaged in any other business, and there is quite enough in the record to satisfy us that he was, generally, the managing

member of the family, whether the business done was his own or his wife's and carried on in her name. In reference to this hotel business in Union Springs, we have no information of its character and extent, nor what capital Mrs. Thompson had invested in it, nor what means she had, except that sometime while living in Union Springs, just when does not appear, her father gave her $2,200. The family continued to live there until April, 1885, when they removed to Anniston, Ala. J. D. Thompson testified that, at that time, April, 1885, his wife had $4,000, derived from the money her father had given her, and money made in the hotel business. She testifies that she then had $5,000, and her son swears to the same. In 1886, the next year after their removal to Anniston, her father gave her $800. We thus have, at the highest point, cash resources, other than rents realized in Anniston, to which we will refer later, $5,800. We notice, however, that sometime prior to the 10th day of November, 1884, J. D. Thompson received and converted to his own use $2,700, belonging to his wife's statutory separate estate, and on that day, November 10, 1884, he conveyed to her a lot on Noble Street and one on 11th Street, in the city of Anniston, in payment of $2,000 thereof. This conversion, it will be observed, more than absorbed the equivalent of the $2,-200 given her by her father, and trenched upon her hotel profits, in Union Springs, $500; so that if she had $5,000, in cash, in April, 1885, when she removed to Anniston, her hotel business yeilded her a net saving, in five years, of $5,500. But neither of the respondents make any allusion anywhere to this matter. It is brought forward by the complainants. Let us assume, however, that the resources were, as claimed, $5,800, and see, from the testimony, what purposes they have been made to subserve. In the latter part of the year 1885, they built a two story, brick hotel, with twelve or fifteen rooms, on the Noble Street lot, above mentioned. One witness fixes the cost of it at about $2,000; another at $3,000 or $3,500. On January 10, 1887, J. D. Thompson bought one-third interest in the Aderhold property, in South Anniston, at the price of $1,666.66, paying $833.35 in cash, his wife's money, and promising to pay the balance in the future. (The same property which was afterwards used in buying the stock of books, &c.) Ear-

[Thompson v. Tower Manufacturing Co.]

ly in 1887, J. D. Thompson bought, for and in the name
of his wife, a lot on Quintard Avenue in Anniston, at the
price of $4,375, paying with her money, $875 in cash,
and paying thereafter, prior to 1889, the further sum of
$1,700, total $2,575, leaving a balance owing of $1,800,
for which Mrs. Thompson was sued in 1889, and which
was afterwards settled by her husband. Sometime in
the same year, 1887, they built a house on this last
named lot, at a cost, Mr. Thompson says, of $700, or
$800. We thus gather from the evidence, with reason-
able certainty, that they expended after going to Annis-
ton, more than $6,000 in the purchase and improvement
of real estate there. J. D. Thompson expressly testifies
that the money received by Mrs. Thompson from her
father went for expenses, to pay for real estate, to im-
prove real estate and in various other ways. In addi-
tion to these specific investments, we have already seen
that V. L. Thompson testifies, that of the $3,562.80 paid
by him on his indebtedness, he paid some of it to John
Noble, Jr., and Sr., others of it to O. H. Parker, some of
it taxes on her property, and for repairing the same. It
is clear none of these payments represented the same
expenditures for purchase money of land, above men-
tioned; and if they represented expenditures for the im-
provements we have noted, it has not been so explained.
We are left utterly in the dark as to how much of this
$3,562.80 was paid by V. L. Thompson to his mother.
They could have explained it with perfect ease, but have
not done so. With the burdens justly resting upon Mrs.
Thompson to satisfy us on the subject, we are forced to
the position of treating the matter as if none of it was
paid to her. To these large expenditures of money
must be added the necessary family expenses from April,
1885, to January, 1889, nearly four years. It is a strange
fact that though Mr. and Mrs. Thompson were particu-
larly interrogated upon the subject, neither of them
could or would give any idea or approximation whatever
of the amount of these expenses. Their minds were
blank upon the point. We know, however, they must
have been considerable—many hundreds if not several
thousand dollars. We have intimated that J. D. Thomp-
son was the managing member of the business affairs of
the family. We have carefully examined the record,
and believe we are safe in saying that it shows he con-

ducted every business transaction on the part of himself or wife, going so far, in some instances, as to take titles in his own name. He had no other business of his own. His wife knew actually nothing of the details of the purchase of the stock of goods from V. L. Thompson on January 3, 1889; did not know what became of them; don't know what they sold for, and in fact had no more to do with the business than a mere stranger. She shows this by her own testimony. About the only business we hear of her doing was to loan money to her son, and the general statements we find in the testimony of the three that *she* carried on a hotel business. It is a rational conclusion from the facts, as they are disclosed in the record, that, practically, as to Mr. and Mrs. Thompson, there was, in all these transactions, but one business, which was presided over by J. D. Thompson, and out of which had to come the expenses of the family.

But, it is insisted that means of making these loans were derived also from profits on real estate speculations. Two such speculations are brought to light—no other. First, the Aderhold property was bought at $1,666.66, and sold at $3,000; and there is no doubt that V. L. Thompson received this $3,000, which was paid by Binford, to whom the land was sold, in a stock of books, stationery &c., transferred to V. L. Thompson, and with which he began the book and stationery business on April 1, 1887. This is all brought out by the complainants. The written contracts which explain the whole transaction and show that the stock of books &c., were bought with this land for V. L. Thompson, to set him up in business, were not produced by respondents, but were by the complainants.

It seems there was some subsequent improvement of the hotel lot in Anniston, of which we have a very undefined idea; and in order to make the improvement they sold a part of the lot and mortgaged the rest of it, and used the proceeds of the sale and the money borrowed for that purpose. There is no specification of any other sale or speculation.

Again: it is said Mrs. Thompson realized large revenues from keeping hotel in Anniston, and renting out the hotel. The evidence on this subject is about as vague and indefinite as it could well be presented. The hotel, as we have seen, was built late in 1885. The Thomp-

sons testify that Mrs. Thompson kept it a part of the time and rented it out a part of the time, realizing a revenue from it; but when called on to testify how much was realized they both answer that they don't know, and make no effort to approximate. How long she kept the hotel and how long rented, we have no information, except we find incidentally, it was rented to Hawks for two months, at $100 per month, and to Olmstead for nine months at the same price; and the nine monthly rates given by Olmstead were used in paying the balance due on the purchase money of the Aderhold property.

Under the conditions thus shown, the proposition is, that Mrs. Thompson loaned to her son, from May 1, 1886, to January 1, 1889, the sum of $13,880. It might be enough to say that she has, by no means, shown her ability to make such loans. When we come to examine the direct testimony, by which they are attempted to be supported, we find the deposition of J. D. Thompson first appears. When asked to state the dates and amounts of the loans, he answers: "I cannot give the amounts and dates of such advances without looking at a memorandum of them which I have. (Witness reads from memorandum and answers as follows:)" He then proceeds to set forth an irregularly stated list of loans, giving the exact date and the amount of each, the first six of which run from May 1, 1886, to December 14, 1886, inclusive, aggregating $1,340; then February 24, 1887, $190; then April 1, 1887, Olmstead notes, 8 of them, $800; then June 11, 1888, $125; then May and June, 1888, Hawk's rent notes, $200; the next two items in November and December, 1888, $1,275; then rent for dwelling in 1888 and 1889, $360 (1889 being practically after the bill of sale was made); then, without date, board for clerks in store and hands in printing office, $960; then, without date, services of "my" minor son, R. Dupont Thompson, $360. He then goes back to to 1887, and states, June 27, 1887, cash loaned, $750; then back to February 5, 1887, $445; then three loans in March, April and July, 1887, aggregating $1,840; then April 1, 1887, real estate, $3,000. (This is the Aderhold property with which the stock of books, etc., was bought). Then 1888 is taken up again, and from January 5th, to October 1st, inclusive, seven loans are stated, aggregating $2,210, which with the

four loans for 1888, above stated, make for that year, $3,810. There is not a semblance of testimony tending to show where this memorandum came from; what knowledge J. D. Thompson had of its correctness; what account of the loans, if any, was kept, nor by whom kept. The only knowledge whatever which this witness shows he possesses as to the cash loans, is that he made some of them himself, and his wife made some. How many made by each we do not know, though she says she made the most of them. Though papers evolved out of their transactions, which are brought to view in this case, as well as other testimony, show that they did their business through banks, yet in all these many loans, there was not a check drawn, as they both testify. They were all made in currency. There was not a receipt taken, a note executed, nor any account kept, so far as there is a witness to give us the information.

Next comes the deposition of Mrs. Thompson, and here we find a literal adoption of the irregularly stated and disjointed account brought forward by J. D. Thompson, set out in her answer to the interrogatory, item by item; and exactly the same thing is found in V. L. Thompson's deposition; not one of them essaying to give any explanation whatever as to how the evidence of these loans was preserved. The only specific statement we have, is from V. L. Thompson, wherein he says, that when he borrowed $1,000 from his mother, on January 5, 1888, he is certain $800 of it was obtained by her from her father, for she remarked at the time, that it was. We remember the fact that the $800 was received by her from her father in 1886; so that if the witness is correct, she retained this money in her possession for 18 months, or more, during a time in which the undisputed proof shows Mrs. Thompson was pressed with debt. We think J. D. and C. A. Thompson set their son up in business, by letting him utilize the Aderhold land with which to buy his stock, but that he paid them back before the crash came.

We will not further enlarge this opinion. The evidence leaves our minds without the least doubt that the decree of the chancellor is right; and it is accordingly affirmed.