# Louisville & Nashville Railroad Company *v.* Williams, *et al.*

## Damage for Loss of Goods.

(Decided Nov. 30, 1911.  Rehearing granted May 28, 1912.
59 South. 673.)

1. *Evidence; Bill of Lading; Parol to Vary Writing.*—The bill of lading issued to a common carrier contemporaneously with the acceptance of freight for transportation is a legal binding contract and cannot be varied by parol, in the absence of fraud or mistake.

2. *Same.*—A contract complete in all its parts relating to an executory agreement, delivered by one of the parties to the other, and retained by such party is, as a general rule, conclusively presumed to contain within itself the sole evidence of the contract, and cannot be modified by parol evidence.

3. *Contract; Construction; Several Writings.*—Where several writings are made part of one transportation, they must be read together, and each must be construed with reference to the other whether of the same date or not.

APPEAL from Montgomery City Court.

Heard before Hon. ARMSTEAD BROWN.

Action by J. J. Williams and another against the Louisville & Nashville Railroad Company.  Judgment for plaintiff, and defendant appeals.  Reversed and remanded.

The complaint was as follows:

"1.   Plaintiffs claim of the defendant the sum of $322.83 and interest thereon from August 21, 1908, as damages for the breach of a certain contract entered into on the 2d day of June, 1908, whereby defendant agreed, for a valuable consideration, to receive from plaintiff 100 bales of cotton, and to ship, transport and deliver the same at Liverpool, England, by a certain steamship, to wit, the Saltmarsh; but plaintiffs aver that, although the said 100 bales of cotton were deliv-

ered to defendant in full time for shipment by said steamship Saltmarsh, defendant failed to ship and transport said cotton by said steamship, but held the said cotton for a long time, to wit, for more than 30 days, and shipped and transported said cotton by another and later steamship, to wit, the Vibina, whereby said cotton did not arrive in Liverpool until more than 30 days after the arrival of the Saltmarsh at Liverpool. And plaintiffs aver that during said interval of time the market price of the said cotton declined, so that plaintiffs were forced to sell the said cotton at a lower and lesser price than they would and could have gotten for the said cotton, had it arrived on the Saltmarsh. Hence they sue.

"2.    The plaintiffs claim of the defendants the sum of $322.83 and interest thereon from August 21, 1908, as damages for the breach of a certain contract, as follows: That on, to wit, 2d day of June, 1908, defendant agreed, for a valuable consideration, to receive of plaintiffs and ship, transport and deliver in Liverpool, England, 100 bales of cotton, agreeing to transport the same by a certain steamship, to wit, the Saltmarsh; that said cotton was delivered to defendant on, to wit, 15th of June, 1908, in full time for shipment by said Saltmarsh, and that said Saltmarsh arrived in Liverpool on, to wit, 17th July, 1908, but that defendants failed to ship said 100 bales of cotton by said Saltmarsh, but held the same for a long time, to wit, 30 days, and shipped the cotton by another and later steamship, to wit, Vibina; that the Vibina arrived in Liverpool on, to wit, 14th August, 1908, but that owing to the delay in unloading the said cotton was not delivered to said plaintiffs until, to wit, 21st August, 1908.

"And plaintiffs aver between the date of the arrival of the Saltmarsh and of the arrival of the Vibina the

market price of the said 100 bales of cotton declined, so that plaintiffs were forced to sell the said cotton at a much lower and smaller price than they would and could have gotten, had the cotton arrived on the Saltmarsh. Wherefore plaintiffs were damaged in the sum aforesaid, and hence they sue.

The facts were agreed upon, and were as follows:

"During the year 1908, the Louisville & Nashville Railroad Company was a common carrier, operating a line of railroad for the carriage of freight from the plant of the Atlantic Compress Company at Pensacola, Florida, to the port of Pensacola. On May 25, 1908, J. J. Williams, doing business in Liverpool, England, under the firm name of J. J. Williams & Co., cabled to Elmore, Quillian & Co., a partnership doing business in Montgomery, Alabama, the following message: "Cannot accept your offer but give you counter offer, same terms for two hundred bales on the basis of .60 for July, August, delivery." Elmore, Quillian & Co., replied to this message, the reply reaching Williams & Co. May 28, 1908, as follows: "Have filed your order one hundred bales provided at not under 6.40." Williams & Co. the same day cabled Elmore, Quillian & Co. the following: "We confirm purchase one hundred bales, invoice at .42, hurry forward shipment, draw at thirty days sight crediting us with the difference. Draw on us for this order."

"On June 1, 1908, Elmore, Quillian & Co. applied to R. H. Davis, who was the booking agent of the Louisville & Nashville Railroad Company for foreign freight at Montgomery, Ala., to quote them rates on cotton from Pensacola, Fla., to Liverpool, England, by the steamship Saltmarsh; which was then advertised and expected to arrive in Pensacola, Fla., June 5, 1908. Davis quoted a rate of 25 cents per hundred pounds for ocean

freight by the steamship Saltmarsh, which rate Elmore Quillian & Co. accepted, subject to confirmation by the Louisville & Nashville Railroad Company. Davis, on June 1, 1908, telegraphed to J. A. Bywater, who was foreign freight agent for the Louisville & Nashville Railroad Company at Louisville, Ky., as follows: "Book account Elmore, Quillian & Co., 100 bales Liverpool at ocean 25 cents, steamer Saltmarsh. Confirmed. Also give refusal two hundred bales more. R. H. Davis." To this message J. A. Bywater replied on the same day, as follows: "R. H. Davis, Montgomery, Ala. Have booked under contract B 91' account Elmore & Quillian one hundred bales Liverpool steamer Saltmarsh. All right give refusal two hundred more. Get all you can. Steamer due on 5th. J. A. Bywater." This last telegram was shown to Elmore, Quillian & Co., by Davis, or its contents reported to them by him. J. A. Bywater, on June 1st, telegraphed Funch, Edye & Co., of New York, who were agents for the Pensacola Trading Company, owners of the line of steamers connecting with the Louisville & Nashville Railroad Company at Pensacola, Fla., as follows: "Book one hundred bales of cotton to Liverpool ocean 25 cents contract nine hundred and thirteen confirm." Funch, Edye & Co. replied, on June 2, 1908, as follows: "We confirm contract B 913 Liverpool, one hundred bales; what have you reported under contract B 912."

"Elmore, Quillian & Co., on June 11, 1908, delivered to the Atlantic Compress Company at Pensacola, authorized receiving agents of cotton for the Louisville & Nashville Railroad Company, the 100 bales of cotton in question, and received from the Louisville & Nashville Railroad Company two bills of lading therefor, which bills of lading are hereto attached and made a part of this agreed statement of facts.

[Louisville & Nashville Railroad Company v. Williams, et al.]

"Upon receipt of the bills of lading, Elmore, Quillian & Co. prepaid all ocean freight and terminal charges at Pensacola, according to the rate quoted by Davis and confirmed by Bywater. From June 11th to June 17th, the cotton was held by the Atlantic Compress Company for account of and subject to the order of the Louisville & Nashville Railroad Company.

"The Louisville & Nashville Railroad Company owned tracks from the Atlantic Compress Company's plant at Pensacola to the wharves at Pensacola, and operated trains over such tracks; from the Atlantic Compress Company's plant to the wharf is a distance of about three miles.

"The bills of lading were received by W. W. Brame, a member of the firm of Elmore, Quillian & Co.; but no partner, agent, or employee of Elmore, Quillian & Co. read the bills of lading, other than to see that the blanks specifying the marks, number of bales, weights, shippers, and consignees were properly filled in. These bills of lading were immediately attached to drafts drawn by Elmore, Quillian & Co. upon J. J. Williams & Co. for the purchase price of the 100 bales and hypothecated with a bank. Upon presentation, this purchase-money draft was accepted and paid by J. J. Williams & Co. at maturity.

"The steamship Saltmarsh commenced loading at Pensacola for Liverpool on June 12, 1908. The hundred bales of cotton involved in this case were switched by defendant from the Atlantic Compress Company's plant to the Louisville & Nashville Railroad Company's wharf on June 17, 1908, at which wharf the steamer Saltmarsh finished loading for Liverpool on June 23, 1908. That in loading the steamer Saltmarsh was tied up against the Louisville & Nashville Railroad Company's wharf. That freight was trucked over the wharf to the side of

the steamer and hoisted thereon by winches, etc. The agent and stevedore of the Saltmarsh had charge of and control of loading the vessel and the selection of the freight tendered, under the direction of her master.

The 100 bales of cotton was tendered to the vessel or agent therefor by the Louisville & Nashville Railroad Company in the following manner: A list of all freight including this 100 bales, engaged for the steamer was made out by the Louisville & Nashville Railroad Company and delivered to the master of the vessel, or the agents of the vessel; and in this case the foreign freight agent of the Louisville & Nashville Railroad Company was not notified that the cotton in question would not be loaded upon the steamer Saltmarsh.

The Saltmarsh arrived in Liverpool July 17, 1908, without having on board the cotton in question. The steamer Vibina, owned and operated by the same company, one of the same line, and also connecting with the Louisville & Nashville Railroad Company at Pensacola, Fla., arrived in Liverpool August 14, 1908, with the cotton in question on board. Compliance with port rules, quarantine, and trade regulation in Liverpool made it impossible, during 1908, for cotton arriving by boat to be sold within less than 10 days from the date of arrival of the boat.

"The cotton in question was delivered to consignees, J. J. Williams & Co., on August 24, 1908, which was the first day after the arrival of the cotton upon which it could be sold in Liverpool. Had the cotton arrived by the Saltmarsh, it could not have been offered for sale in Liverpool before July 27, 1908.

"The grade of the cotton was Liverpool good middling; the weight 48,412 pounds. The market price of cotton of that grade in Liverpool on July 27, 1908, was 6.17 pence per pound, and on August 24, 1908,

it was 5.60 pence per pound. The current rate of exchange was $4.85 per pound sterling. Williams & Co., without any knowledge or notice of delay in the shipment of the cotton, and before the cotton was shipped from Pensacola, according to the usual custom of cotton merchants, had "hedged" in the future cotton market in Liverpool 100 bales of cotton, upon which "hedge" they gained a profit of £10. 1s. 8d.

"It is further admitted that 2 cars of billets were shipped by the steamer Saltmarsh, the freight engagement for which was entered into June 17, 1908; that certain shuttle blocks were shipped by the steamer, the freight engagements for which were made after June 10, 1908; that numbers of hogsheads of tobacco were shipped by that steamer, the freight engagements for which were made after June 1, 1908; and that 110 bales of cotton were shipped by that steamer, the freight engagements for which were made June 15, 1908, or later. Neither Elmore, Quillian & Co., nor J. J. Williams & Co., were notified of any delay in this shipment by the Louisville & Nashville Railroad Company, or by any one else, until the steamer Saltmarsh arrived in Liverpool.

"The case was tried by the court, without the intervention of a jury, and from the above facts the Court of Appeals came to the conclusion that the trial court, sitting as a jury, had the right to reasonably conclude as follows:

"First. That through the above telegrams the plaintiff and the defendant made, on June 2d, a valid contract, whereby the plaintiff agreed to deliver at Pensacola, the terminus of the defendant's railroad, and a seaport, 100 bales of cotton, which, at a rate of freight then agreed upon, the defendant agreed to ship for the plaintiff to Liverpool by the named steamer

Saltmarsh, on a particular sailing of that vessel from Pensacola to Liverpool, to wit, its June sailing.

"Second. That, pursuant to the above contract, the plaintiff delivered to the defendant at Pensacola, on the 11th day of June, the 100 bales of cotton, for the purpose of having it shipped to Liverpool, under the above contract, by the Saltmarsh, which was then at the defendant's wharf at Pensacola, and that the cotton was accepted by the defendant, under the terms of the above contract, for that purpose.

"Third. That when the bill of lading was delivered, the circumstances attending its delivery and the previous telegraphic correspondence indicated that the delivery of the bill of lading by the defendant and its acceptance by the plaintiff was not intended by either of them to efface what had previously been agreed upon between them, and that it was not intended by either of them that the bill of lading should be the sole evidence of the contract.

"Fourth. That the bill of lading itself refers to the previous telegraphic correspondence, and that thereby the telegrams were made a part of the bill of lading, and that, as the telegrams were in writing, the words contained in them were of more importance than the printed parts of the bill of lading and controlled the printed parts, and that the bill of lading, read in connection with the telegrams which formed a part of it, showed that the true contract between the parties was that the defendant was to ship the cotton on the Saltmarsh on its June sailing, and not on any other ship, or at any other sailing.

The above being the facts and the inferences which the Court of Appeals drew from the facts, the Court of Appeals affirmed the judgment of the trial court, as appears from the first opinion published herewith,

and also found in 56 Southern 865. Thereupon the case was appealed by writ of certiorari to the Supreme Court, and the Supreme Court held that the bill of lading was the sole evidence of the contract of shipment, and reversed and remanded the case for further proceedings in the Court of Appeals.—*Williams v. L. &. N. R. R. Co.*, 58 Southern 315. Thereupon, in remanding the case to the trial court for further proceedings the Court of Appeals rendered the second opinion published herewith, and found in 59 Southern 673.

R. Tyler Goodwyn, for appellant. The rule which requires that all prior and contemporaneous negotiations and agreements concerning the making of the contract are to be construed and read with reference to each other, applies to bills of lading, as well as to other contracts, and in the absence of fraud or mistake it is conclusively presumed that the oral negotiations are merged in the bill of lading.—4 Elliott on Railroads, sec. 1423; *L. & N. v. Fulgham*, 91 Ala. 555; *Tallassee F. M. Co. v. Wes. Ry.*, 117 Ala. 520; *Delaware v. Oregon I. Co.*, 14 Wall. 579. A railroad company without special contract to that effect is not liable for goods carried beyond its line, where it safely carries and safely delivers them to the connecting carrier, and a special contract to that end will not be gathered from doubtful expressions or loose language. —*Michigan Cent. v. Myrick*, 107 U. S. 102.

Ludlow Elmore, for appellee. This case should be affirmed on the authority of the *Northern Pac. R. R. Co. v. American T. Co.*, 195 U. S. 439.

DE GRAFFENRIED, J.—1. This suit was brought by appellee against appellant for recovery of damages

for the breach of a contract which the plaintiff alleges was made by the defendant with him to transport and deliver to him by the steamer Saltmarsh 100 bales of cotton, and which the appellant failed to do. The contract of shipment was made by appellant with Elmore, Quillian & Co., and in making the contract appellee was not disclosed as a party in interest. It is contended by appellee that Elmore, Quillian & Co., were his agents in the making of said contract, and that the contract was made for his benefit. The evidence supports this contention, and appellee had a right to maintain this suit in his own name. The case of *Lucas v. Railroad Company,* 122 Ala. 529, 25 South. 219, which announced a contrary doctrine, was expressly overruled by the Supreme Court, in the case of *Manker v. Western Union Telegraph Co.,* 137 Ala. 292, 34 South. 839.

2.   The facts are that the Pensacola Trading Company is a corporation, and owns a line of steamers connecting with the Louisville & Nashville Railroad Company at Pensacola, Fla., and its steamers are engaged in the business of transporting freight to and from Pensacola, Fla., and Liverpool, England. Funch, Edye & Co., with headquarters in New York, were the general agents of said Pensacola Trading Company. Elmore, Quillian & Co. were cotton factors, doing business in Montgomery, Ala., and, on or about the 28th day of May, 1908, they sold to appellee, whose place of business is Liverpool, England, and who does business under the name of Williams & Co., 100 bales of cotton, and on that day appellee wired them to hurry forward the cotton to Liverpool. On June 1st, acting under the instructions received from appellee, Elmore, Quillian & Co., applied to R. H. Davis, booking agent of the appellant for foreign freight at Montgomery,

Ala., to quote them rates on 100 bales of cotton from Pensacola to Liverpool by the steamer Saltmarsh, which was then advertised to reach Pensacola on June 5th. Davis quoted a rate which Elmore, Quillian & Co. accepted, subject to confirmation by appellant. Davis, on June 1st, telegraphed to J. A. Bywater, who was foreign freight agent for appellant at Louisville, Ky., as follows: "Book account Elmore, Quillian & Company, 100 bales Liverpool at ocean 25 cents. Steamer Saltmarsh. Also give refusal two hundred bales more. R. H. Davis." To this message, J. A. Bywater replied on the same day as follows: "R. H. Davis, Montgomery, Ala. Have booked under contract B 913 account Elmore, Quillian & Company one hundred bales Liverpool steamer Saltmarsh. All right give refusal two hundred more. Get all you can. Steamer due on 5th. J. A. Bywater." This last telegram was shown to Elmore, Quillian & Co. by Davis, or its contents reported to them by him. J. A. Bywater, on June 1st, telegraphed Funch, Edye & Co., of New York, as follows: "Book one hundred bales of cotton Liverpool, ocean 25 cents contract nine hundred and thirteen confirm." Funch, Edye & Co. replied, on June 2, 1908, as follows: "We confirm contract B 913 Liverpool, one hundred bales; what have you reported under contract B 912." Elmore, Quillian & Co., on June 11th, delivered to the Atlantic Compress Company, at Pensacola, Fla., the authorized receiving agents of cotton for appellant, the 100 bales of cotton and received therefor a bill of lading. Upon the receipt of the bill of lading, Elmore, Quillian & Co. prepaid all ocean freight and terminal charges.

Appellant owned two tracks from the Atlantic Compress plant at Pensacola to the wharves at Pensacola, and operated trains over such tracks. The distance

40 CA

between the compress company's plant and the wharves was three miles. The bill of lading was received by W. W. Brame, a member of the firm of Elmore, Quillian & Co., but no partner, agent, or employee of Elmore, Quillian & Co. read the bill of lading, other than to see that the blanks specifying the marks, number of bales, weight, shippers, and consignees were properly filled in.

The steamship Saltmarsh commenced loading for Liverpool at the wharves of appellant at Pensacola on the 12th day of June, and finished loading for Liverpool on the 23d day of June. The cotton remained at the Atlantic Compress Company's plant until June 17th, five days after the Saltmarsh had commenced her loading. The 100 bales of cotton were tendered to the vessel by the appellant in the following manner: A list of all freight, including this 100 bales, engaged for the steamer was made out by appellant and delivered to the master of the vessel, and on June 17th the 100 bales of cotton were switched by appellant from the compress company's plant to appellant's wharf, where the Saltmarsh was loading. The master of the Saltmarsh, it appears, had the right, under the custom of the steamer, to say what freight he would take or refuse to take upon any particular trip. In the present instance, certain cotton, billets, shuttle blocks, and other freight which appellant had contracted to be shipped by the Saltmarsh on this particular trip, and which contracts were made *after* June 1st, were accepted by the master and carried to Liverpool, but the steamer failed to receive the 100 bales of cotton in controversy, and the same was carried to Liverpool about one month later by another steamer of the steamship company by name The Vibina, and by reason of the

delay in the shipment, on account of a decline in the cotton market, appellee was damaged.

There are certain stipulations in the bill of lading which was delivered by appellant to appellee on June 11th which provide that appellant shall, on account of the *rate* of freight therein named, only be liable for damages occurring to freight while on its own line, and that its liability as a common carrier ceases upon the tendering of freight to its connecting carrier. Appellant claims that as it tendered to the Saltmarsh on the 17th day of June, six days before the steamer finished loading, it had performed all of the duties which it owed as a common carrier to appellee in the premises, and that it had a right, under a stipulation in the bill of lading, to ship the cotton to Liverpool by the next steamer which left Pensacola for Liverpool, viz., The Vibina, and that, having met the letter of its contract as set out in its bill of lading, appellee was not entitled to recover.

The appellee had a binding contract with appellant on June 1st, by virtue of the telegrams which are above set out, to ship the 100 bales of cotton by the Saltmarsh on its return to Liverpool in June from Pensacola. The facts in this case are different from those where a shipper merely delivers goods to a common carrier for shipment to a point beyond its destination through the medium of its connecting carriers in the ordinary course of business. In the present case there was, in effect, a legal, specific agreement on the part of appellant to reserve the shipping space in the steamer Saltmarsh for 100 bales of cotton, to be carried by said steamer to Liverpool on the 23d day of June, and to carry said cotton by said steamer on said trip, and the fact that the master of the Saltmarsh failed or refused to transport the cotton furnishes appellant with

no defense for the breach of its contract. Appellant made the contract with appellee, and it took the precaution to have that contract sanctioned by the duly authorized representatives of the Saltmarsh before appellee delivered any cotton to it under the contract.

This case is similar in all of the legal questions involved. to the case of the *Northern Pacific Railroad Company v. American Trading Company*, which is referred to by the counsel for the appellee in his brief. In that case a contract of shipment was made by the receivers of a railroad company to ship a lot of lead from the city of New York over the line of the railroad to Tacoma, Wash., and by a certain steamer from Tacoma to Yokohoma, Japan. The contract in that case was made prior to the delivery of the lead to the railroad company, and after the lead was delivered to the railroad company a bill of lading was delivered by the railroad company, similar in all respects to the bill of lading in this case, to the shippers of the lead. The lead reached Tacoma in time for the steamer, and was actually loaded on the steamer, but as China and Japan were then engaged in war with each other, and as the authorities of the United States government at Tacoma were in doubt as to whether the lead was or was not a contrabrand of war, the collector of the port refused to clear the vessel while the lead was on board, and the master unloaded the lead, and the next day sailed without it. The railroad company forwarded the lead by the next vessel but in the mean time lead had declined, and the receivers of the railroad company were held liable under their contract of shipment. In that case the Supreme Court of the United States used the following language:

"It is urged that the bill of lading constitutes the sole contract, but there was a plain, valid contract ex-

isting between the parties before the lead was shipped, and before any bill of lading was issued. That special contract was to forward the lead by the steamship leaving Tacoma on the 30th day of October. The next day after the lead was shipped at Newark a bill of lading was delivered to one of the clerks of the trading company, and that bill of lading contains the absolutely inconsistent statement that the carrier is not to be liable for any loss not occurring on its own road, and that the contract, as executed, is accomplished and all liability thereunder terminates upon the delivery of the property to the steamship. It is said that the trading company, by receiving this bill of lading and obtaining money on it as the representative of the property therein described, has acquiesced in the total abolition of the special contract the company made with Fitch, and has agreed that the railroad company shall be under no liability after the delivery of the lead to the steamship. We regard it as entirely clear that no such effacement of the original contract was meant by the receipt of the bill of lading. The railroad company had no power alone to alter that contract, and it could not alter it by simply issuing a bill of lading, unless the other party assented to its conditions, and thereby made a new and different contract."—195 U. S. 439, 25 Sup. Ct. 84, 49 L. Ed. 269.

It is true that in the above cases the lead had actually been delivered to the railroad company before the issuance of the bill of lading, and in the present case the cotton seems to have been delivered to appellant contemporaneously with the delivery by the appellant to appellee of the bill of lading. In the above case, as in the present case, the bills of lading were not read by the parties to whom they were delivered, and the fact that the bill of lading in this case was deliv-

ered to appellee contemporaneously with the delivery of the cotton to appellant cannot avail the appellant.

The bill of lading recites that it was accepted in consideration of the *special* rate which was given appellee. Appellee had already made a valid contract with appellant for the shipment of the cotton to Liverpool by the Saltmarsh at an agreed rate of compensation, and the freight rate set out in the bill of lading is identical with the freight rate which had been previously agreed upon by the parties when the real contract of shipment was made. The truth is that the delivery of the cotton to appellant was made under the contract which had previously been entered into by the parties, without regard to the issuance of the bill of lading; and the issuance of the bill of lading was merely in accordance with custom, for the convenience of appellee, and as an evidence of title to and right to receipt for the cotton when it reached Liverpool. Under his contract, appellee, when he delivered the cotton to appellant, was entitled to its shipment to Liverpool by the steamer Saltmarsh in June, 1910, and the delivery of the cotton to appellant was under the contract and in anticipation that it would be in all things complied with.

Under the facts in the present case, we, as did the Supreme Court of the United States in the above case of the *Northern Pacific R. R. Co. v. American Trading Co.*, refuse to hold that appellee, in accepting the bill of lading, thereby consented to the complete alteration of his original contract, and without any consideration whatever, agreed to release the railroad company from all liability on that contract, and to take in its stead the reduced liability provided for in the bill of lading.

The fact that appellee, before the Saltmarsh reached Pensacola, made a special arrangement with appellant for the shipment of the cotton by that steamer on her return to Liverpool in June, and the fact that the booking agent in Montgomery did not make the contract on behalf of appellant until he had received special authorization so to do from the foreign freight agent of appellant in Louisville, Ky., and that the foreign freight agent in Louisville made a special arrangement with the general agents of the Saltmarsh in New York for the shipment to be made on that particular trip, preclude us from holding that the mere reception of an unread bill of lading, issued in accordance with custom, by appellant upon the delivery of the cotton at Pensacola was intended by any of the parties to in any way alter the contract which had previously been made. Appellee had no contract with the Saltmarsh for the shipment of the cotton. Appellant *did* have a valid contract with that steamer for its shipment, and, having failed to require the Saltmarsh to carry out its contract with it, appellant is not only legally but morally responsible to appellee for the damages resulting to him from the breach of the contract.

The judgment of the court below is affirmed.

Affirmed.

## On Application for Rehearing.

As there was a judgment in this case against the appellant, we treated, in the above opinion, all the material inferences which could legally be drawn from the evidence in favor of the appellee as established facts. We therefore came to the conclusion that on June 1st the appellee, through his authorized agent in Montgomery, made with the appellant, through its agent in

Montgomery, a legal, binding contract with appellant to ship one hundred bales of cotton by the named steamer "Saltmarsh" when it sailed from Pensacola in June. The telegrams were set out in the opinion as evidence of the fact that appellant's agent in Montgomery had the power to make the contract. As was stated by us in the above opinion, "the facts in this case are different from those where a shipper merely delivers goods to a common carrier for shipment to a point beyond its destination through the medium of its connecting carriers in the ordinary course of business," and as we recognized that this contract was one not in the ordinary course of dealings by a railroad with its customers, but one out of such regular course and for which some special authority should be shown in order that the company might thereby be bound, we deemed the telegrams of sufficient importance to set them out in the opinion.

It may be, as insisted by appellant in its application for a rehearing, that the expression "B 913" contained in the above telegrams referred to a bill of lading subsequently to be issued, but if so, the evidence, all of which was agreed upon, does not indicate it. A railroad man, reading the telegrams, might so understand it, but a man of ordinary intelligence not acquainted with customs among railroads would not. The ambiguity could have been explained by evidence if the telegrams meant what appellant claims for them, but it failed to offer any evidence on that subject.—*Barron v. M. & O. R. S. Co.*, 2 Ala. App. 555, 56 South. 862.

The application for a rehearing is overruled.

DE GRAFFENRIED, J.—1. The only question presented to us on this appeal—and it was a question to which we gave much consideration—was whether,

when the appellee delivered the cotton to appellant and paid the freight, thereby in all things complying with his part of the contract concluded in Montgomery by telegraphic correspondence on the 2d day of June, the appellee, by accepting, under the circumstances shown by this record, the bill of lading handed to him by the compress company, thereby effaced the contract which he already had with appellant.

Hardship does not make shipwreck of principle; but there is no rule in any enlightened jurisprudence through which injustice can be legalized; and, taking into consideration the situation of the parties, the evident purpose and importance of the telegraphic correspondence, the time and the manner of the delivery of the bill of lading, and the character of its stipulations, we are unable to say that the minds of the appellee and appellant met on the subject under discussion when the bill of lading was delivered, or, in fact, under the peculiar circumstances of this case, that the delivery and acceptance of the bill of lading was intended by either of the parties as an effacement of their previous agreement.

In the case of *L. & N. R. R. Co. v. Meyer,* 78 Ala. 597, Mr. Justice Stone said: *"Possibly* if contemporaneously with the delivery of the goods to the railroad, he (the shipper) had received the bill of lading containing such stipulation (a stipulation limiting the carrier's liability to its own road), he would be conclusively presumed to have read it, and to have acquiesced in it.—*Goetter v. Pickett,* 61 Ala. 387; *Dawson v. Burrus,* 73 Ala. 111. And this would have been no hardship; for he would have had it in his power to reject the terms. Failing to read the contract he was accepting *might be fairly* interpreted as an expression of full confidence and an agreement to ac-

cept the terms they would offer." In the above excerpt the italics are ours, and that excerpt is taken from the opinion in a case where the bill of lading was made out by the carrier in the presence of the shipper at the time of the delivery of the freight, and all the blanks filled out, except the amount of freight. This blank was not filled out, because the freight agent did not know the amount of the freight; and the shipper left with the agent on deposit what was agreed between them as a sufficient amount to pay the freight when the exact rate was ascertained. The next day the agent ascertained the amount of the freight, filled out the blank, and forwarded the bill of lading, together with the surplus money remaining in his hands, to the shipper. The shipper kept the bill of lading, the goods were lost on a road other than that of the initial carrier, and the Supreme Court held that the bill of lading was *not* the evidence of the contract of shipment. In the *Meyer Case* there was no previous written contract of shipment; in the instant case there was. In the *Meyer Case there* was no rate of freight previously agreed upon; in the instant case there was. In the *Meyer Case* the bill of lading was not delivered and accepted, because Meyer did not know how much freight to pay, but he left the money to pay the freight, and the facts not only show that he knew that the bill of lading would follow so soon as the freight rate was ascertained, but it *did* follow, and Meyer retained it. "Possibly," said Mr. Justice Stone, "if the bill of lading had been delivered when the freight was delivered, the shipper would be conclusively presumed to have read it, and to have acquiesced in it."

Of course, the general rule announced in *Ala. G. S. R. R. Co. v. Thomas*, 83 Ala. 343, 3 South. 802, and in *Jones v. Cincinnati, Selma & Mobile R. R. Co.*, 89

Ala. 378, 8 South. 61, that when a bill of lading lim-
iting the liability of a receiving carrier to loss or dam-
age on its own line is, at the time of the delivery
of freight, tendered by the carrier and accepted by the
shipper, this is a *legitimate, i. e., lawful, limitation*
on the *measure* of the *carrier's liability,* and is bind-
ing on each of the parties to such a contract, is fa-
miliar. The general rule that, "in the transportation
of freight, the bill of lading embodies the contract be-
tween the shipper and the carrier, and, when deliver-
ed by the carrier and received by the shipper, its terms,
stipulations, and conditions are as binding on the par-
ties thereto as are the terms, stipulations, and condi-
tions *of any other contract,* and that it is to be taken
as the sole evidence of the final agreement of the par-
ties by which their duties and liabilities must be reg-
ulated, and *parol* evidence is inadmissible to vary its
terms or legal import," is also familiar.—*L. & N. R.
R. Co. v. Fulgham,* 91 Ala. 555, 8 South. 803; *Tallas-
see Falls Mfg. Co. v. Western Ry. of Ala.,* 117 Ala.
520, 23 South. 139, 67 Am. St. Rep. 179.

That the doctrine last above quoted is simply the
application by the Supreme Court to bills of lading of
the well-known proposition that, in the absence of
fraud or mistake, the terms of a written instrument
cannot be varied by *parol evidence,* and nothing more,
is apparent from the facts of and the real questions
involved in the two cases last cited, as well as by the
language of the Supreme Court as applied to the facts
in the case of *A. G. S. R. R. Co. v. Norris,* 167 Ala.
311, 52 South. 891, which was the last deliverance of
the Supreme Court upon the subject until it handed
down the opinion in the present case. In the *Norris
Case, supra,* a shipper of freight sued a common car-
rier of goods for damages for a failure to deliver, and

for delivering in a damaged condition, a lot of household goods. The goods were to be delivered by the initial carrier, through connecting carriers, to the shipper at the point of destination. There was a bill of lading similar in all of its provisions to the one now under consideration, and the bill of lading was delivered by the carrier to the shipper *at the time of the delivery* by the shipper to the carrier of the freight. When the goods were delivered, however, there was an oral—not a written—agreement that the goods should be loaded in *one box car* and carried *through* to the point of destination, although the freight was to go over connecting lines, *in that car.* In that case the bill of lading was delivered by the carrier to the shipper *simultaneously* with the delivery by the shipper to the carrier of the freight; and the question before the Supreme Court was whether, under the circumstances, the bill of lading was the *sole* evidence of the contract of shipment, or whether both the oral and the written agreements, *taken together,* were to be held to be the true contract of shipment. The Supreme Court held that the *oral* and the written agreements, taken together, constituted the contract of shipment, and that the bill of lading, although delivered and accepted *simultaneously* with the delivery and acceptance of the freight, was not the *sole* evidence of the contract; in other words, that under such circumstances—circumstances showing that the bill of lading was not intended by the parties to be the sole evidence of the contract of shipment—a bill of lading delivered as above stated was no more to be considered as the sole evidence of the true contract of shipment than, under similar circumstances, any other writing was to be held to be the sole evidence of any other sort of contract.

In that case the court said: "A bill of lading is of a dual character and effect; one is that of a receipt, and the other that of a contract. As a rceipt, like other receipts, it is open to explanation or modification by parol evidence; as a contract it, *like other contracts,* must be construed according to its terms, and, in the absence of fraud or mistake, it is presumed that all *oral* negotiations respecting its terms and conditions are merged therein; that it forms the final and sole receptacle of the evidence, and of the agreement between the parties as to the *reception, rate, route,* etc. —*L. & N. R. R. Co. v. Fulgham,* 91 Ala. 555, 8 South. 803; *McTyer v. State,* 26 Ala. 478; *Wayland v. Mosely,* 5 Ala. 430, 39 Am. Dec. 335; *Tallassee, etc., Co. v. Western Ry. Co.,* 128 Ala. 167, 29 South. 203. A contract of shipment need not be in writing—it can as well be oral—but if it *is in writing, the same law and the same rules of construction and proof apply to it as to other written contracts.* And, although a bill of lading is issued by the carrier, *it may, of course, be shown that this was not the contract of shipment,* but that the shipment was under *another* and *different contract,* whether oral or in writing.—Authorities supra; Elliott on Railroads, § 1415 et seq."

The above broad language of the Supreme Court was used in a case in which the bill of lading was delivered by the carrier to the shipper contemporaneously with the acceptance by the carrier of the freight, and in that case no question of fraud or mistake was involved. It is evident, from the above language, applied to the facts then under consideration, that the Supreme Court has never intended to put, or in fact put, bills of lading upon a pedestal, or placed them in a class to themselves, but that the court intended to group them with all other written evidences of con-

tracts, subjecting them to the same tests and the same rules of law which are applicable to all written contracts as a class. In other words, it is evident that a bill of lading is not a legal fetish—a word to conjure with—but, when delivered and accepted under such circumstances as to constitute a legal, binding contract of shipment, is subject to the same rules of construction as other contracts in writing. On account of the vast number of such contracts and the constant abuse to which common carriers would be subjected at the hands of unscrupulous shippers, if the courts permitted any of the rules relative to contracts in writing to be relaxed as to bills of lading—in short, on account of the wide door to perjury which would thus be thrown open—the Supreme Court of the United States and the courts of last resort of the various states of the Union, with wonderful unanimity, have rigidly applied in favor of common carriers every reasonable rule applicable to written contracts to bills of lading; but our Supreme Court, in the above opinion in the case of *A. G. S. R. R. Co. v. Norris,* clearly indicates that it had not exempted, and did not intend to exempt, bills of lading, simply because they are contracts of affreightment, from any of the general and well-recognized rules which govern *all* written contracts.

While, as a general rule, a contract, complete in all its parts, which relates to an executory agreement, and which is delivered by one of the parties to the other party, and which is retained by such party, will be conclusively presumed to contain within itself the sole memorial of the contract (*Cornish v. Suydam,* 99 Ala. 629, 13 South. 118; *Mylin v. King,* 139 Ala. 319, 35 South. 998), nevertheless it is also a well-recognized rule, that where several writings are made as part of one transaction, they will be read together, *each be-*

*ing construed with reference to the other;* and this is true whether all of the writings are made on the same day or not.—9 Cyc. p. 580, § 6, and authorities cited. In fact, it is but a legal truism that when two writings are connected by the reference of one to the other they may and should, ordinarily, be construed as constituting one and the same contract in the same manner as if embodied in one instrument.—2 Mayfield's Dig. p. 762, § 155, and authorities there cited.

In this case the telegrams introduced in evidence contained the significant words "contract B 913," and the bill of lading, evidently referring to the telegrams, also contains the same words "contract B 913." The telegrams and the bill of lading therefore, certainly by numbers, expressly and unequivocally *refer* to each other. Indeed, on the application to this court for a rehearing, the argument was strongly pressed by appellant that even *before* the bill of lading *was issued* it must have been within the contemplation of the parties, on account of the use of the words and figures "contract B 913" in the telegrams, that a *bill of lading* was *afterwards* to be issued and this court expressed the opinion that, *before* the issuance of the bill of lading, a layman would probably not have so understood. When, however, the bill of lading *was* issued, it referred directly, at the head of it, to the "contract B 913," which was, as above stated, the number of the contract entered into by the telegraphic correspondence and there seemed to us to be no escape from the conclusion that the bill of lading, when issued, if forming a part of the contract of shipment, adopted the telegrams as a part of it to the same extent as if they had been written in the body of the bill of lading itself. Acting upon this assumption, we were forced to the conclusion that if the telegraphic correspondence was not in fact

the true written evidence of the contract of shipment, this correspondence was, to say the least, a part of the written parts prevailed over those printed parts of the bill of lading in conflict with the purposes expressed by the parties in such telegrams.—2 Mayfield's Dig. p. 614, § 114.

It cannot be denied that the telegrams show that the parties intended the cotton to be shipped by the Saltmarsh on its *June* sailing. The reason for the telegrams was that the parties desired a shipment of the cotton on that vessel on its *June sailing,* and by no other vessel on any other sailing. If, therefore, all the writings touching this matter and referring to each other are to be construed together—and we saw no way to escape, at least, that conclusion, if, indeed, under the peculiar circumstances, the bill of lading was to be treated as anything more than a mere receipt— then the telegrams not only formed a part of the *writing* in the bill of lading, but one of the most important parts of its writing, and fixed conclusively the evidence of the intent on the part of the Louisville & Nashville Railroad Company to carry out the agreement made on June 2d to have the cotton carried to Liverpool by the Saltmarsh on its June sailing.—2 Mayfield's Dig. p. 614, § 114.

Taking into consideration the situation and evident intent of the parties when, by telegraphic correspondence, a definite agreement was made for the shipment of a designated amount of cotton by a designated steamer plying, not between ports on some inland river, but between ports on different continents and separated by the Atlantic Ocean; that the delivery of the cotton, under the telegraphic correspondence, was to be made to appellant, *not* for transportation to the designated seaport, Pensacola, but *at* Pensacola, the terminus,

necessarily, of its line at that point; that when the delivery was made to the compress at Pensacola, the receiving agent of appellant at Pensacola of cotton for ocean shipment, the Saltmarsh, the steamer designated in the telegraphic correspondence as *the* steamer to take the cotton, was then at the *wharves of appellant,* its smoke probably visible from the point of delivery, and that it was *then* loading cotton for its *June* sailing; that the delivery was made by the appellee for the purpose of carrying out his part of the contract made by the telegraphic correspondence; that the rate of freight demanded and paid was the rate previously agreed upon by the telegraphic correspondence; that the telegrams and the bill of lading each referred to "contract B 913," thereby, after the *delivery* of the bill of lading, necessarily referring to each other; that a bill of lading, under some circumstances, is only a receipt for the goods shipped, and that when operating *as a receipt and a contract* its printed parts, when in conflict with its written parts, are controlled by the written parts—we were constrained to hold, under the very language of the opinion in the *Norris Case, supra,* that the delivery of the bill of lading, under the circumstances above indicated, could not, as matter of law, be held to have been intended by the parties to destroy or completely obliterate the contract previously made in writing. "A contract of shipment," says the court in *A. G. S. R. R. Co. v. Norris, supra,* "need not be in writing—it can as well be oral—but if it is in writing, the same law and the same rules of construction and proof apply to it as to other written contracts." As there were several writings relative to the shipment, and as they all referred to each other, or by referring to "contract B 913" showed that they all related to the same subject, we considered them all; and, while

we knew that the question was not without doubt or difficulty, we did know that courts of justice sit "for the purpose of securing and protecting the real interests of parties, and not for dealing with abstractions." (*Ex parte Randall,* 149 Ala. 640, 42 South. 870) ; that, in construing a contract, the intention of the parties is to be given effect; and that, where several instruments are made as parts of one transaction, they will be read together, and each will be construed with reference to the other (9 Cyc. 579, 580) ; and we refused to hold "that appellee, in accepting the bill of lading, thereby consented to the complete alteration of his original contract and, without any consideration whatever, agreed to release the railroad company from all liability on that contract, and to take in its stead the reduced liability provided for in the bill of lading."

We were of the opinion that the facts of this case placed it under the rule declared in the case of *Northern Pacific R. R. Co. v. American Trading Co.,* 195 U. S. 439, 25 Sup. Ct. 84, 49 L. Ed. 269. It is true that in that case the bill of lading was issued *after* the lead was delivered; but *that fact* was not advanced by the Supreme Court of the United States as the controlling fact upon which it based its opinion in that case. It was *one* of the reasons, but not the *only* reason, advanced by that court as influencing it in holding that the bill of lading was not to be treated, under the facts of that case, as the only evidence of the contract of shipment.

As we were confronted with facts which rendered it difficult to determine which of two well-established, but opposite, rules of law should be applied to them, we resolved all doubt that may have existed in our minds in favor of that rule which seemed to carry into effect the real intent of all the parties, as gath-

[Louisville & Nashville Railroad Company v. Williams, et al.]

ered by us from their situation, the objects which they desired accomplished, and the telegrams and bill of lading, *their writings,* which related to the same subject-matter, and certainly by numbers ("contract B 913") referred to each other. In the *Norris Case, supra,* the *oral* agreement and the bill of lading, not being in conflict with each other, were held to be the true contract of affreightment and in this case we were, as we have already stated, of the opinion that the telegrams, if not to be taken as the true exponent of the contract between the parties, were at least to be read into the bill of lading as a part of its *written* parts, thereby controlling any printed matter in the bill of lading in conflict with them.

While this case was tried upon an agreed statement of facts, the contract, as construed by the Supreme Court, was made in Florida, and was to be executed in England. While we might indulge the presumption that the laws of those countries are the same as our own, this case was evidently tried in the court below—as it was argued and considered here—as an Alabama contract; and it may be that, upon another trial, by proper amendment of the pleadings, the agreed statement of facts may be supplemented by evidence establishing the laws of Florida and, if pertinent, the laws of England as to what the contract of affreightment, under such laws, if, indeed, they differ from our own, were.—*Harrison v. Southern Railway Co.,* 119 Ala. 539, 24 South. 552, 43 L. R. A. 385, 72 Am. St. Rep. 936.

In the case of *Alabama & Florida R. R. Co. v. Watson,* 42 Ala. 74, the Supreme Court held that an agreement between the parties to a suit that "every matter and thing which could be legally pleaded in bar should be deemed as fully pleaded," etc., was merely a plea

of the general issue; and the Supreme Court, in that case, refused to treat such an agreement as presenting to the court any matter of defense which the defendant, under the law, could not avail himself of under the plea of the general issue. In the case of *Converse Bridge Co. v. Collins,* 119 Ala. 534, 24 South. 561, the Supreme Court, in effect, overruled the decision in *Watson's Case, supra,* and committed itself to a contrary doctrine; and since the rendition of the opinion in the case of *Collins, supra,* it has, so far as this court is informed, been the universal custom of all our courts to consider the plea which appears in the present record as complete authorization to a defendant to avail himself of any special defense to the same extent as if specially pleaded.

As the Supreme Court has held that the bill of lading in this case was the sole evidence of the contract of affreightment, and as it was a Florida, and not an Alabama, contract, we are of the opinion that, in this case, the judgment of the court below should be reversed, and the cause remanded to the lower court for further proceedings in that court.

Reversed and remanded.